COMMONWEALTH OF PUERTO RICO, represented by its Governor, Plaintiff and Respondent, *v.* HEIRS OF FELIPE GAUTIER, ETC., Defendants and Petitioners.

No. 12583.   Submitted August 10, 1959.—Decided September 10, 1959.

*Luisa María Capó* and *Yamil Galib Frangie* for petitioners.
*Hiram R. Cancio, Secretary of Justice, Arturo Estrella, Assistant Secretary of Justice* and *V. M. Sánchez Fernández, Assistant Attorney General*, for respondent.

MR. JUSTICE SERRANO GEYLS delivered the opinion of the Court.

In this case petitioners submit to this Court two questions on the power of eminent domain. In the first they attack the constitutionality of the legislation on condemnation appli-

cable to urban redevelopment and renewal projects and in the second the appraisal of the condemned property.

The Commonwealth, represented by its Governor, filed a condemnation suit against the owners of a parcel of land located in the city of Ponce, site known as Palo de Pan. Among these owners are petitioners. The complaint stated that the proceeding was instituted "at the instance and for the use and benefit of the Municipal Housing Authority of Ponce" and enumerated the laws which authorized it.[1] It added that it was instituted "in order that the aforementioned Municipal Housing Authority of Ponce be vested with full dominion title to the property . . . that said Authority proceed to eliminate the Palo de Pan slum located in Ponce, Puerto Rico, and which includes the properties sought to be condemned, which will be devoted by the Authority to a redevelopment project, pursuant to Act No. 97, approved May 9, 1947" and the other Acts. It asserted also that "the acquisition of the properties involved in this action is of public necessity and the purpose in acquiring them is of public utility." In paragraph (8) it was stated that "the Authority . . . has deemed it desirable, convenient, advisable and necessary, to acquire the properties involved in this action to carry out the said public work, which determination it made by approving Resolution No. 676 of February 3, 1955." Other allegations proper to these proceedings were also included, among them, that the Planning Board had approved the acquisition of the properties necessary to carry out the said public work. The deposit of funds required by the Act was also made. After the usual proceedings the defendants answered, raising the same questions which are now under our consideration. After a hearing, the Superior

---

[1] Condemnation Act of March 12, 1903 (Sess. Laws, p. 50); Act No. 126 of May 6, 1938 (Sess. Laws, p. 253); Act No. 97 of May 9, 1947 (Sess. Laws, p. 226); Act No. 364 of May 10, 1952 (Sess. Laws, p. 720); Joint Resolution No. 46 of June 8, 1954; and the National Housing Act of 1949, Public Law 171, 81st Congress.

Court rendered its conclusions and judgment. It upheld the constitutionality of the legislation challenged and increased the compensation to be paid for the property from $4,640 to $7,333.33.

The petitioners present the constitutional question from two points of view: "1. The lower court erred in concluding that the legislation on which the plaintiff relies in its application to the case at bar does not deprive the defendants of their property without due process of law or that it is not tantamount to the exercise of the power of eminent domain in benefit of private interests denying the defendants their right to an equal protection of the laws." "2. The lower court erred in concluding that in the case at bar the defendants do not have right to the restoration of the property sought to be condemned upon payment by them to the plaintiff of the sums used by the latter in improving said property."

However, in their brief the petitioners confine their argument to a challenge of the "public use" of the condemnation and to alleging that Art. II, § 9 of the Constitution of the Commonwealth of Puerto Rico has been violated.[2] They do not question that the public purpose of clearing the Palo de Pan slum exists in this case, but they assign that that purpose can be obtained by removing the condemned structures and leaving the land in the hands of its owners for them to develop it in accordance with the existing Acts and regulations of planning and construction. They add that in this case, contrary to that of *Berman* v. *Parker*, 348 U.S. 26 (1954), there is no evidence on the specific plan of redevelopment to be carried out and they do not exclude "the possibility that said land be offered to the highest bidder to establish there a private development for well-to-do persons and/or

---

[2] "Private property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law."

private commercial establishments and for purely lucrative purposes."

■■■ We shall begin, perforce, with a description of the legislative plan and its purposes. Section 1 of the "Redevelopment and Housing Law" (17 L.P.R.A. § § 101–119), declares that there exist in many communities within Puerto Rico blighted areas [3] or areas in the process of becoming blighted and that such areas impair economic values and tax revenues, cause an increase in and spread of diseases and crime and constitute a menace to the health, safety, morals, and welfare of the residents of Puerto Rico, and also "that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities." It is concluded that "the clearance, replanning, and preparation for rebuilding of these areas, and the prevention or the reduction of blight and its causes, are public uses and purposes" and that it is in the public interest that such areas and other similar ones "be acquired by eminent domain and made available for sound and wholesome development and that the exercise of the power of eminent domain and the financing of the acquisition and preparation of land by a public agency for such redevelopment is likewise a public use and purpose." It is declared furthermore that redevelopment activities "will stimulate residential construction"; "will aid the production of better housing and more desirable neighborhood and community development"; and "will assist materially in achieving and maintaining full employment." Section 2 authorizes the housing authorities to acquire blighted areas

---

[3] In its § 2 the Act defines blighted areas (including slum areas) as "areas . . . with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement, or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community."

and real property for removing or reducing blight or where the existent conditions prevent a proper development of the property and are necessary to carry out a redevelopment plan; to clear the areas acquired; and to sell or lease the acquired land. It grants all the powers necessary for carrying out the projects. (Section 3.)

Every redevelopment plan must be approved by the Planning Board and must indicate "its relationship to definite local objectives as to appropriate land uses and improved traffic, public transportation, public utilities, recreational and community facilities and other public improvements"; the proposed land uses and building requirements; the method for the temporary relocation of the residents; and the method for providing them "decent, safe, and sanitary dwellings." (Section 4.) "With the approval of the Puerto Rico Planning Board the Authority may make land in a redevelopment project available for use by private enterprises or public agencies in accordance with the redevelopment plan." (Section 5.) The purchasers or lessees shall use the land for the purpose designated in the redevelopment plan, begin the building within a reasonable time and comply with such other conditions as are necessary to carry out the purposes of the Act. The "obligations by the purchaser shall be covenants and conditions running with the land where the authority so stipulates." (Section 5.)[4]

The provisions outlined in the previous paragraph are unequivocal proof of the care exercised by the lawmaker in conceiving and framing this program. Such mandates are directed, undoubtedly, to guarantee the strict compliance of the public purposes expressed in the Act. They prevent the condemned area from becoming again an undesirable place and that persons living there may, by means of a simple

---

[4] In 1957 a "preference to residents displaced by projects" was established for the acquisition of residential lots in "redeveloped" land, whenever "the Authority . . . may deem it feasible, and if compatible with the method adopted for disposal of said lands." (17 L.P.R.A. § 119.)

transfer en masse, repeat elsewhere the deplorable living conditions and urban design that is sought to be eradicated. Without these or similar precautions the official effort would become a bitter farce, and the condemnation a meaningless and inexcusable act of power.

For the purposes stated in the Act any Authority may borrow money (including the issuance of bonds) or accept grants from the federal government.[5]

This Act is supplementary to other housing Acts in which the Legislature has expressed purposes similar to those already described and has designed other instruments to help solve the problem.[6] Outstanding among these Acts is Act No. 126 of May 6, 1938 (17 L.P.R.A. § § 31–54). It authorizes the Authorities[7] to acquire by eminent domain any real property which it may deem necessary for attaining the purposes of the Act, among them, slum clearance. The Act (§ 3) defines "slum" as "any area where dwellings predominate which, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitary facilities, or any combination of these factors, are detrimental to safety, health or morals." The Authorities may, subject to certain limitations, sell or lease the land acquired by eminent domain to private persons. (17 L.P.R.A. § § 38, 66–76.)

Federal and state case law is actually abundant with regard to the problem of the constitutionality of urban renewal and redevelopment Acts. Equally prolific is the litera-

---

[5] Act No. 82 of June 20, 1955 (Sess. Laws, p. 302) and Act No. 66 of June 17, 1957 (Sess. Laws, p. 154—17 L.P.R.A. § § 112–119), added several sections to the original Act but did not alter in essence the purposes and organization of the system. They contain in several aspects legislative statements more explicit than those found in the original Act.

[6] Examine Title 17 of L.P.R.A., which includes the Acts on Housing Cooperation, Urban Renewal and Housing Administration Corporation, and Slum Clearance.

[7] The functions of the Authorities were transferred in 1957 to the Urban Renewal and Housing Administration and Corporation (17 L.P.R.A. § § 21–24).

ture on the subject.[8]   The problem is one of multiple aspects and in some of them fine adjustments are required between the right of individual property and the government power of taking property for public use.   Considering the nature of the issues in the present case, we believe that the unanimous opinion of the Federal Supreme Court in *Berman* v. *Parker, supra,* written by Mr. Justice Douglas, and dealing with urban renewal Acts of the District of Columbia, practically identical to ours, expresses clearly not only the general applicable principles but also the answers to the petitioners' specific objections.   It would be, therefore, completely useless and in a certain way symptomatic of the desire to be original at any price, to elaborate an opinion to say practically the same thing that Mr. Justice Douglas has said with such lucidity, elegance, and authority.   For that reason we copy several paragraphs of that opinion and adopt the principles and rules contained therein for our own jurisdiction and our own applicable constitutional provisions.   In so doing, we reserve, naturally, our power to give specific content in future cases to the generalizations included in these paragraphs, in accordance with the legislative mandates and the pertinent administrative actions and with the particular circumstances of those cases and of our medium.

"The power of Congress over the District of Columbia includes all the legislative powers which a state may exercise over its affairs.   We deal, in other words, with what tradition-

---

[8] Citation of decisions and competent commentaries thereon are found in Lavine, *Extent of Judicial Inquiry into Power of Eminent Domain,* 28 So. Cal. L. Rev. 369 (1955) ; *Public Use as a Limitation on Eminent Domain in Urban Renewal,* Annotation in 68 Harv. L. Rev. 1422 (1955) ; *Validity, Construction and Effect of Statutes Providing for Urban Redevelopment by Private Enterprise,* Annotation in 44 A.L.R. 2d 1414 (1955) ; Guandolo, *Housing Codes in Urban Renewal,* 25 Geo. Wash. L. Rev. 1 (1956) ; Marquis, *Constitutional and Statutory Authority to Condemn,* 43 Iowa L. Rev. 170 (1958) ; Johnstone, *The Federal Urban Renewal Programs,* 25 U. of Chi. L. Rev. 301 (1958) ; *Urban Renewal: Problems of Eliminating and Preventing Urban Deterioration,* Annotation in 72 Harv. L. Rev. 504 (1959).

ally has been known as the police power. An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determinations addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition.⊀ Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia or the States legislating concerning local affairs. This principle admits of no exception merely because the power of eminent domain is involved. The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one.

"Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it. Miserable and disreputable housing conditions may do more than spread disease and crime and immorality. They may also suffocate the spirit by reducing the people who live there to the status of cattle. They may indeed make living an almost insufferable burden. They may also be an ugly sore, a blight on the community which robs it of charm, which makes it a place from which men turn. The misery of housing may despoil a community as an open sewer may ruin a river.

"We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patroled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation's Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way.

"Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end. Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established. The public end may be as well or better served through an agency of private enterprise than through a department of government—or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects. What we have said also disposes of any contention concerning the fact that certain property owners in the area may be permitted to repurchase their properties for redevelopment in harmony with the over-all plan. That, too, is a legitimate means which Congress and its agencies may adopt, if they choose. ✗

" .        .        .        .        .        .        .        .

". . . But as we have already stated, community redevelopment programs need not, by force of the Constitution, be on a piecemeal basis—lot by lot, building by building.

"It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.

"The District Court indicated grave doubts concerning the Agency's right to take full title to the land as distinguished from the objectionable buildings located on it. We do not share those doubts. If the Agency considers it necessary in carrying out the redevelopment project to take full title to the real property involved, it may do so. It is not for the courts to determine whether it is necessary for successful consummation of the project that unsafe, unsightly, or insanitary buildings alone

be taken or whether title to the land be included, any more than it is the function of the courts to sort and choose among the various parcels selected for condemnation.

"The rights of these property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts as the price of the taking." (348 U.S. 31–34, 35–36. Citations have been omitted.)

The constitutionality of the urban renewal and redevelopment programs has been upheld by a host of the state supreme courts in the face of attacks similar to those that we are considering.[9] In former judgments we have accepted in our community the wide legislative discretion as to the determination of the "public use" subject to a modest judicial intervention;[10] the condemnation of land for slum clearance;[11] and the distribution, cession or lease of condemned land to private persons for the attainment of a public purpose or benefit.[12] We decide, in view of the foregoing, that the urban renewal and redevelopment Acts of Puerto Rico have full constitutional validity, from their face as well as in their application to the specific facts of this case.

▬▬▬ In their second contention the petitioners attack the appraisal of the property fixed by the lower court. They maintain that "in view of the special circumstances of the case at bar" the court erred in using the method of capitalization of rent and in weighing the evidence. It is indispensable, therefore, that we examine the evidence considered by the trial judge.

---

[9] Johnstone, *op. cit. supra*, at 312; Annotation in 44 A.L.R. 2d 1414.

[10] *McCormick* v. *Marrero, Judge*, 64 P.R.R. 250, 256 (1944); *Commonwealth* v. *Fajardo Sugar Co.*, 79 P.R.R. 303, 312, 315 (1956).

[11] *Municipality* v. *Planning Board*, 68 P.R.R. 600, 603 (1948); *Housing Authority* v. *Sagastivelza*, 72 P.R.R. 262, 269 (1951).

[12] *Commonwealth* v. *Fajardo Sugar Co., supra*, at 317–18; *People* v. *Saldaña*, 69 P.R.R. 663, 667–772 (1949). That is also the opinion of the Circuit Court of Appeals. *People of Puerto Rico* v. *Eastern Sugar Associates*, 156 F.2d 316, 323–324 (C.C.A. 1, 1946) cert. denied, 329 U. S. 772 (1946).

At the time of filing the complaint plaintiff deposited in court the sum of $4,640 as the just compensation for petitioners' land, which is divided into four parcels. Of this amount, $3,000 were for parcel No. 1, $750 for No. 2, $405 for No. 3, and $485 for No. 4. Also attached to the complaint was a plan of the area containing the location and size of the parcels and their boundaries. The evidence on the conditions of the land refers to April 29, 1955, date on which the Commonwealth took the property.

The defendants offered the testimony of a witness, husband of one of the defendants. He testified briefly that the property is located near several important highways, that its most profitable use is that of development, that similar lots were worth $8.00 per square meter and that he knew this because some "friends" had informed him; that the parcels had facilities of light, water, and sanitary services, and the sewerage system was very near; that the land is level and that it was leased to third parties; that all the parcels were leased for $60 a month and from $51 to $60 a month were received as rent; that there were from 39 to 40 houses on the parcels and that he knew that those houses had to be acquired in order to urbanize. The defendants offered no other evidence.

J. M. Canals, a civil engineer and a very experienced appraiser, testified for the plaintiff. His capacity was accepted by the defendants. The witness testified that he had used two methods to appraise parcel No. 1 (3,452 square meters). By the first method he appraised the land and the structures at $16,000, based on the market value and the most profitable use of the land.[13] From that amount he subtracted $12,640—the value of the structures—computed

---

[13] He assigned a value of $5 per square meter to the parcel based on other sales of lots at $6 and $7 but which faced paved streets. This parcel does not face a paved street except for an extent of 10 meters. The rest is bounded by an alley or path. He used values of $4.50 and $6.00 for two of the other parcels due to differences in the location.

on the basis of reconstruction cost less depreciation by observation, since the original cost and the date of construction were unknown. This method produced a result of $3,360 as value of the land. He also applied the method of capitalization of rent and on the basis of a total rent of $41 a month, which sum had been established by a personal investigation, and capitalizing it at 7½ per cent he obtained a value of $3,280. In parcels Nos. 2, 3, and 4 he only used the first method and obtained values of $750, $405, and $485 for the land, after deducting the value of the structures.

Canals also testified that he had examined the books in the Registry of Property and conferred with purchasers and vendors and had determined that there had not been similar sales in that area; that no developments existed near the area at the time of the assessment and the taking by the Commonwealth because they were constructed later; that the most profitable use of the parcels would be to destroy the structures and make a residential area; that he had made the assessment in 1953 and that in 1955 the Ponce market fluctuated in an increase from 10 to 15 per cent over 1953 with regard to the total property and from 5 to 10 per cent with regard to the land.

After describing the parcels and the structures [14] thereon and after stating the afore-mentioned facts on the location, topography and services, the trial judge concluded that "the most adaptable use would be to devote it to a modern development." He considered, however, that "its development would be so costly as to become economically prohibitive" because the 49 structures would have to be acquired, some of them after long and costly judicial proceedings; they would have to be destroyed and the land cleared before undertaking the development, pursuant to the regulations in force. The parcels, which have an area of 4,500 square meters, would yield a small number of lots that would be located in a slum

---

[14] "Houses in poor conditions, low-priced, unsafe, and antisanitary."

area. He concluded that "its undesirability would become evident", that "the business would be an absolute economic failure", and that, consequently, the most profitable use would have to be discarded as a method of appraisal. He then used the method of capitalization of rent and on the basis of a monthly income of $55, capitalized at 9 per cent, he fixed an appraisal of $7,333.33.

The petitioners have "two basic objections" to that conclusion. They mention first that Exhibits A-1 and A-2 show [15] that at the time of the taking there were only four structures on the parcels and not forty-nine as the court concluded and that, therefore, the parcels "were not subject to that unfavorable factor." They forget that their own witness testified that "on or about 1955" small houses for rent were located on the property which netted between $51 and $60 a month, that there were 40 houses and that he knew that in order to construct a development there he had to acquire the 40 houses.[16] The plaintiff's evidence permitted the court to increase that number to 49.

Secondly, the petitioners maintain that in this case the method of capitalization of rent is clearly objectionable. They say that that method is used when the property is devoted to its most profitable use and that it can not be concluded that "the maintenance of a slum area by means of leases" constitutes such profitable use. On the contrary, such use would be to build a modern development on the parcels and in such case the appraisal should be $5 per square meter.

---

[15] Plaintiff's attorney explained for the record that although it appeared from the allegations of the complaint that there were four houses "there were actually more."

[16] Tr. Evid. at 23, 27, 28–30. The witness examined a list of payments (Tr. Evid. at 26) to fix the number of houses at 40. It is also very questionable, although we need not decide it, if in fixing the appraisal the court could not take into account that the Commonwealth had cleared the land for the petitioners prior to the taking.

But petitioners meet with an invincible obstacle. They could not present any evidence in support of their theory nor placed the judge in a position to appraise the land on the basis of the probable construction of a development.[17] Their method relies then "on uncertain and speculative bases." [18] *People* v. *Huyke*, 70 P.R.R. 720, 722 (1950). We said in that decision:

"For the purpose of making a just appraisal we must consider the land as a whole and not as lots to be condemned; we should not take as a basis what a speculator, at his peril, might be able to obtain in the future, but the price that a buyer is willing to pay at a voluntary sale and that at which a vendor, under like circumstances, would be willing to sell, taking into account the condition of the land at the time of the condemnation and the most profitable use to which the owner might devote it within a reasonably near future."

No lots were condemned in the present case either, but only a parcel of 4,500 square meters, which contained 49

---

[17] In a condemnation proceeding in which the question at issue is the amount to be paid to the owner, the latter holds the position of a plaintiff and must prove his right to recover a larger amount than that deposited. *People* v. *García*, 66 P.R.R. 478, 481 (1946); *People* v. *632 Sq. Mts. of Land*, 74 P.R.R. 897, 910 (1953).

[18] "In determining the market value of a piece of real property for the purposes of a taking by eminent domain, it is not merely the value of the property for the use to which it has been applied by the owner that should be taken into consideration. The possibility of its use for all purposes, present and prospective, for which it is adapted and to which it might in reason be applied, must be considered. Its value for the use to which men of prudence and wisdom and having adequate means would devote the property if owned by them must be taken as the ultimate test. On the other hand, possible uses which are so remote and speculative and which would require the concurrence of so many extrinsic conditions and happenings as to have no perceptible effect upon present market value must be excluded from consideration." 4 Nichols, The Law of Eminent Domain, 89–97, § 12.314. See also in 5 Nichols, *op. cit.*, § 18.11(2) the discussion of the subject *"Evidence of Potential Use."* Compare, lastly, the evidence on "most profitable use" which was offered and we approved in *People* v. *Ocean Park Development*, 73 P.R.R. 345 (1952) and *Commonwealth* v. *Ocean Park Dev. Corp.*, 79 P.R.R. 149 (1956) with that which the Superior Court had under consideration in the case at bar.

structures, inclosed in a slum area and which at the time of the taking was not near the developments which were later constructed.

In addition to the foregoing, we consider as eminently reasonable the reasons the trial judge had for discarding the possibility that the land could be used for a development at the time of the taking by the Commonwealth. We are aware of the flaws in the method of capitalization of rent,[19] but at the same time we are completely convinced that its use in this condemnation proceeding was the only one permitted by the evidence.

The judgment on review will be affirmed.

Mr. Justice Saldaña and Mr. Justice Hernández Matos did not participate herein.

---

[19] Jahr, Law of Eminent Domain 225–32 (1957); 5 Nichols, *op. cit.* at 214–21, §§ 19.2–19.23.