CERVECERÍA CORONA, INC., Plaintiff and Appellee, *v.*
FRANCISCO LIZARDI, SECRETARY OF PUBLIC WORKS, and
RAMÓN GARCÍA SANTIAGO, CHAIRMAN OF THE PLANNING
BOARD, Defendants and Appellants, and COCA–COLA
BOTTLING COMPANY OF PUERTO RICO, Plaintiff and
Appellee, *v.* FRANCISCO LIZARDI, SECRETARY OF PUBLIC
WORKS, and RAMÓN GARCÍA SANTIAGO, CHAIRMAN OF THE
PLANNING BOARD, Defendants and Appellants.

Nos. R-66-319, R-66-320.     Decided February 28, 1969.

44

*J. B. Fernández Badillo, Rafael A. Rivera Cruz, Solicitors General, J. F. Rodríguez Rivera, Deputy Solicitor General,* and *Peter Ortiz, Assistant Solicitor General,* for appellants. *Iván Reichard* and *Hermán W. Colberg* for appellees.

MR. JUSTICE TORRES RIGUAL delivered the opinion of the Court.

The question in issue in these petitions for review is the validity of the *procedure* prescribed in Act No. 5 of September 28, 1961, 9 L.P.R.A. § 38a *et seq.*, for the summary elimination of signs and advertisements installed in violation of the laws and Zoning Regulations.[1] The power of the Legislature to prohibit and to regulate these signs, justified not only by reasons of security but also of aesthetics, is not questioned—with sound judgment. *Village of Euclid* v. *Ambler Realty Co.,* 272 U.S. 365 (1926) ; *Ghaster Properties, Inc.* v. *Preston,* 200 N.E.2d 328 (Ohio 1964) ; *Murphy, Inc.* v. *Westport,* 40 A.2d 177 (Conn. 1944). See also: Gardner, *The Massachusetts Billboard Decision,* 49 Harv. L. Rev. 869 (1936).

In the early years of this century serious objections were raised in the United States to considering aesthetics as a valid ground for the exercise of the police power. See Cox, *Outdoor Advertisements—Aesthetics and the Public Right,* 33 Tul. L. Rev. 852, 857; 1 Pound, Jurisprudence 436; Rodda, *The Accomplishment of Aesthetics Under the Police Power,* 27 So. Cal. L. Rev. (1954). There were cases where aesthetics was considered a matter of mere luxury, insufficient to support the exercise of the police power. *Passaic* v. *Patterson Bill Posting Co.,* 72 N.J.L. 285 (1905) :

"Aesthetic considerations are a matter of luxury and indulgence rather than of necessity, and it is necessity alone which justifies the exercise of the police power to take private property without compensation." *Id.* 268.

However, gradually the courts began to consider aesthetics as an important and growing public interest for the promo-

---

[1] Act No. 427 of May 13, 1951, 9 L.P.R.A. §§ 31–38 and Roadside Signs and Billboard Advertisements Regulation, 9 R.&R.P.R. § 35–1 *et seq.*

tion of public welfare. *General Outdoor Advertising Co.* v. *Dept. of Public Works,* 193 N.E. 799 (Mass. 1935); *Churchill & Tait* v. *Rafferty,* 32 J.F. 614 (Philippines 1915); Cox, *supra.*

■ The modern trend, with which we agree, is definitively to accept it by itself alone as a valid ground for the exercise of the police power. The Supreme Court of the United States has already set up the bases for this new trend in *Berman* v. *Parker,* 348 U.S. 26 (1954) properly stating that:

"The concept of the public welfare is broad and inclusive. . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." *Id.* 33.

The power of the Legislature to prohibit and regulate these signs having been thus admitted, our task is limited to consider only whether or not the procedure established in the above-mentioned Act No. 5 complies with the guarantees of the due process of law.

Appellees, Cervecería Corona, Inc. and Coca-Cola Bottling Company of Puerto Rico filed in the Superior Court, San Juan Part, a petition for declaratory judgment declaring Act No. 5, *supra,* unconstitutional, on the ground that the procedure therein established does not give the interested parties the opportunity to be heard before the Secretary of Public Works removes the signs and advertisements unlawfully installed. The trial court granted it, concluding that since the signs or advertisements were not a public nuisance per se they could not be removed without a previous hearing where appellees would have the opportunity to be heard and where a determination would be made on the alleged unlawful use.

Relying on comments made in the opinion of *Whitmier &*

*Ferris Co.* v. *N.Y. Thruway Authority*, 242 N.Y.S.2d 386 (1963),[2] the trial court decided:

"14. We decide like the Supreme Court of New York [*sic*] that only the most extreme circumstances involving a newly created danger imminently perilous to the drivers of vehicles on our streets and highways may justify the actions of the Secretary of Public Works removing plaintiff's signs under the summary procedure authorized by Act No. 5. As well put by plaintiff the fact that an advertisement of 'Corona' beer instead of being affixed to a wall, pursuant to the technical requirements of the Zoning Regulations, projects two inches from the wall, does not turn the innocent advertisement into an instrument 'imminently perilous' nor creates an emergency situation which cannot await for an administrative or judicial adjudication after a hearing on the merits before removal. Therefore, such deviation from the principles of the due process of law like the one we find in Act No. 5 is not constitutionally justified."

The judgment is erroneous and should not prevail. An objective analysis of the provisions of Act No. 5, of its legislative history and prior laws, and of the principles of law concerning the abatement of public nuisances so reveals.

■ Our primary function is to establish, or to see that an adequate balance between the public interest in the summary elimination of the nuisance and the individual interest in

---

[2] In said case the Court of Appeals of New York declared itself without jurisdiction. However, if it could be used for anything it is to hold the reverse of what the trial court decided. See the headnotes, from where we copy:

"Statute authorizing the Thruway Authority *without notice* to abate and remove advertising devices erected within a restricted distance of paved portion of a Thruway was a valid exercise of the police power, and even if an owner of an advertising device possessed valid rights which were abrogated by such legislation, that did not provide a basis for declaring the statute unconstitutional." (Italics ours.)

The case of Whitmier clearly recognizes the validity of the statute of New York and cites with approval *N.Y. State Thru. A.* v. *Ashley Motor Court*, 218 N.Y.S.2d 640 (1961) which upheld the constitutionality of said statute.

that property rights be not unduly injured, be established.[3] The approach should be pragmatic rather than theoretical, of a thoughtful analysis of the underlying factors which give rise to the public policy.

█ It leads us to consider the origin, purpose, and scope of the statute; the remedies it provides for the protection of persons affected by possible excesses or arbitrary acts on the part of the officers in charge of applying the law, and the judicial remedies available outside the statute. It is of fundamental importance in the analysis of the statute to consider the existence of adequate judicial remedies for the protection of property rights. We stress, however, that in considering what is or is not adequate we are not necessarily bound by the doctrines and principles established in cases involving different administrative functions, as for example, condemnations, confiscations, revocation of licenses, or award of compensation for labor accidents.

I. The procedure established in Act No. 5 is the culmination of a long legislative effort during more than half a century to promote the safety and welfare on our thoroughfares and to preserve the beauty features and natural landscape. The legislative action in this field began with the approval of Act No. 55 of March 10, 1910, 10 L.P.R.A. §§ 313–320. Said act prohibited the installation of signs and advertisements upon property belonging to, or subject to an easement in favor of the Commonwealth of Puerto Rico, regulated advertisements and signs installed on buildings

---

[3] We notice the discrepancy of views on the character of this function in *Saia* v. *New York*, 334 U.S. 558 (1948). Mr. Justice Douglas sustained in said case the view that courts must balance the interests in conflict in passing on the constitutionality of an act. On the contrary, Mr. Justice Jackson vested that function in the Legislature stating that:

"It is for the local communities to balance their own interests—that is politics—and what courts should keep out of. Our only function is to apply constitutional limitations."

See also: Murphy & Pritchett, *Courts, Judges and Politics, An Introduction to the Judicial Process* 438, Random House (1961).

used for business purposes, imposed an annual tax upon such advertisements and declared a misdemeanor any violation thereof. Subsequently Act No. 427 of May 13, 1951, 9 L.P.R.A. §§ 31–38, was approved; this act prohibits the installation of signs within a distance of 500 meters on both sides from the center of the roads, except in such areas where the Zoning Regulations are effective and such regulations provide otherwise. It also empowered the Planning Board and other public officers to file the pertinent legal action for the abatement or alteration of such signs.

None of the methods utilized by the Legislature—imposition of taxes, delinquent liability, injunctions—were effective. The legislative effort was entirely inadequate, illegal signs and advertisements being extraordinarily multiplied. 14 Journal of Proceedings 215 (1961).[4] The Statement of Motives of Act No. 5 describes at length the failure of the previous procedures and the need to adopt a more effective procedure as is the summary destruction:

### "Statement of Motives

"Act No. 427, of May 13, 1951, as amended, and the provisions of the Zoning Regulations regarding signs and advertisements, constitute one among so many efforts of the Government to afford the proper protection to the people of Puerto

---

[4] When H.B. No. 383, which became Act No. 5, was considered in the House of Representatives, Representative Ortiz stated:

"Now then, *experience has shown that the methods for enforcement, the methods utilized in the basic act to enforce the same, have been entirely inadequate to eliminate this social evil, as prescribed in the Bill.* The violators have not complied in any manner with the provisions of this act and these signs and advertisements are extraordinarily multiplied, and their presence continues, aside from or irrespective of the prohibitions contained in the act itself. For example, an inventory made of the signs from January to April 1961, showed that there were at least 629 signs against the law, and that number has been subsequently increased, insofar as the 'injunction' proceeding is concerned. *The procedure established in view of the congestion of the courts, the delay in carrying out these 'injunction' proceedings, all these factors have established serious difficulties to enforce the purposes of the act. . . .*" (Italics ours.)

Rico. The said Act No. 427 of 1951, established a procedure which, at that time, was deemed sufficiently effective for eliminating from the areas adjacent to our roads certain types of advertisements or signs, as such terms were defined in said act, which tend to cause traffic accidents. *Nevertheless, neither constant surveillance nor other types of governmental action adopted after said act was approved and said provisions of the Zoning Regulations took effect have been able to eliminate hundreds of advertisements and signs illegally maintained in various places of the Island.* In the face of the serious menace which such type of sign or advertising constitutes, and for the purpose of protecting the health, safety and welfare of the citizenry; of promoting the better use and development of our roads; of protecting and preserving the beauty features in urban and rural areas, and the natural landscape, and of promoting tourism, this act is passed in order to create a more effective means for attaining the elimination of signs and advertisements which unquestionably distract the driver's attention, unduly impair and obstruct the proper use of our roads, and which, although constituting a serious menace to safe traffic, and damaging the beauty features, have been installed and maintained in flagrant violation of the provisions of Act No. 427 of May 13, 1951, as amended, and of the Zoning Regulations authorized by Section 9 of Act No. 213 of May 12, 1942." (Italics ours.)

■ The trial court, upon reviewing the validity of the statute, could not ignore this fruitless legislative experience in the formulation of an effective remedy. It must have considered not only the social evil which was sought to prohibit, but also, the multiple difficulties revealed by the legislative record in the application of corrective measures. It constituted important considerations of public policy, which are essential in the determination of the reasonability and necessity of the summary proceeding. It is advisable to recall that in the performance of the delicate mission to review the validity of statutes, the courts should respect the discretion of the Legislature without passing—because it is not our function—on the wisdom or expediency of the statute.

*McCormick* v. *Marrero,* 64 P.R.R. 250 (1944); *Cintrón* v. *Municipal Court,* 67 P.R.R. 743 (1947); *People* v. *Saldaña,* 69 P.R.R. 663 (1949).

II. Let us see now in detail the procedure established in the said Act No. 5:

1. The Planning Board periodically certifies to the Department of Public Works such advertisements and signs as do not meet the requirements of the provisions of Act No. 427, *supra,* and of the Zoning Regulations. By virtue of this certification, the Secretary of Public Works, through written notice, requests the owner, lessee, etc. of the land or building where the advertisement has been installed, as well as the announcer or his agent, to eliminate or remove such sign or advertisement within 30 days after the date of the notice. Section 2, 9 L.P.R.A. § 38b.

2. After the term of 30 days has elapsed, the Secretary of Public Works or the officer to whom he may delegate directs that the advertisement or sign in question be eliminated, removed, or destroyed, and if such advertisement or sign is not eliminated within 10 days, he shall proceed to eliminate it. Section 3, 9 L.P.R.A. § 38c.

3. If it is necessary to enter a private property in order to enforce said act, the Secretary or his delegate shall appear before a magistrate, stating in writing and under oath the facts which justify the necessity of entering said private property. If the magistrate finds that the petition is in accordance with the terms of the act, he shall issue an order authorizing the officer concerned to enter the private property, said officer shall then proceed to eliminate the nuisance. Section 4, 9 L.P.R.A. § 38d.[5]

---

[5] The conditions required by the act for the issuance of these orders are similar to those required for the search warrant authorized by the provisions of the Code of Criminal Procedure (34 L.P.R.A. § 1811 *et seq.*) and by Art. II, § 10 of the Constitution of the Commonwealth of Puerto Rico.

4. Any person who may sustain undue damages through the acts of any public officer or employee in complying with the provisions of said act, is expressly authorized to sue the Commonwealth for damages without subjection to subsections (a) and (b) of § 6 of Act No. 104 of June 29, 1955. Section 5, 9 L.P.R.A. § 38e.

In synthesis, this procedure requires: (a) two notices to the affected persons, (b) a sworn statement and a magistrate's order when it is necessary to enter a private property, and, (c) a judicial remedy for the persons who sustain undue damages as a consequence of acts under the terms of the act. As it can be seen, the affected persons are not barren of protection. The act prescribes first a notice in writing granting affected persons a term of thirty days, and, then a request of ten days. The procedure is not as summary as to prevent affected persons from appearing within said terms before the Secretary of Public Works to file the claims they may deem necessary. Finally they are entitled to file an action for damages by which they can argue on the merits their contentions against the administrative act and may obtain recovery for the damages unduly suffered. The statute provides, then, ample protection to the property rights of affected persons. In common law the latter were only acknowledged an action for damages. *Solly* v. *City of Toledo*, 218 N.E.2d 463 (Ohio 1966); *Hislop* v. *Rodgers*, 92 P.2d 527 (Ariz. 1939); *State* v. *Keller*, 189 N.W. 374 (Neb. 1922); *People* v. *Board of Health*, 35 N.E. 320 (N.Y.C.A. 1893).

III. In the United States, long before the approval of the Constitution, the common law recognized as a valid exercise of the police power the power of the Legislature to denounce public nuisances and to order the destruction thereof without a previous judicial proceeding; *Lawton* v. *Steele*, 152 U.S. 133 (1833); *Upton* v. *Felton*, 4 F.Supp. 585 (1932); *State* v. *Keller, supra; Hislop* v. *Rodgers, supra*, this power extends to both, the abatement of public nuisances per se and the

abatement of public nuisances so declared by the Legislature. *Lawton* v. *Steele, supra; Daniel* v. *Homer,* 51 S.E. 992, 3 L.R.A. (N.S.) 997 (N.C. 1905); *Upton* v. *Felton, supra; contra, State* v. *McCray,* 186 N.W. 280 (N.D. 1921). Of course, the exercise of this power cannot be arbitrary or oppressive. It must be consistent with views of reasonability and necessity.

■ Although a large discretion is vested in the legislature to determine the public interests which demand protection and the measures necessary for the protection of such interests, it cannot declare to be a public nuisance what as a matter of fact is not, *Lawton* v. *Steele, supra.* Neither can the Legislature extend the remedy to more than is necessary. Consequently, a structure utilized for unlawful purposes should not be destroyed when it suffices to close it in order to eliminate such use, as for example, brothels, gambling houses, etc.

■ In other words, the fundamental thing in the validity of the procedure is its reasonability and necessity and not the distinction made by the trial court between public nuisances per se and public nuisances declared to be so by the Legislature for the purposes of justifying the summary removal of the former and not of the latter.

■ Neither is it justified to limit the summary procedure, as did the trial court, to emergency situations exclusively.[6] There is no doubt that in the latter the element of need is more evident.[7] But there are multiple cases where the element of necessity is not so obvious and it is necessary to resort, then, to the origin, prior laws, and legislative history of the legislation in order to be able to perform thoroughly

---

[6] See ante, page 47 Conclusion of Law No. 14 of the trial court.

[7] Take, for example, the case of the killing of a rabid dog or a wild bull loose in the urban zone, the confiscation of decayed food, vaccination in case of epidemic, the destruction of a building for preventing the propagation of a fire, etc.

our judicial function. The procedure to determine whether or not necessity and reasonability exist shall take into consideration the public interests the protection of which gave rise to the approval of the statute, the manner in which the property rights of affected persons are protected, the nature of the nuisance, including its value, difficulty, and the costs of alternative procedures to eliminate it.

We previously considered the importance for the community of the safety on our highways and the preservation of the beauty features of the landscape, as well as the legislative experience of more than half a century in seeking to protect these public interests. We also considered the various judicial and extrajudicial remedies which affected persons have to protect their property rights. It is proper to consider now the other factors previously enumerated.

The evidence shows that a great majority of the signs are of little value, that many of them are installed in such a manner that their removal is expensive and dangerous; that it is a question of hundreds of signs,[8] the removal of which by judicial means would greatly impair the efficacy of the statute. In addition, many of these advertisements were unlawfully installed by appellees, ignoring the Zoning and Construction Regulations.[9]

In *Lawton* v. *Steele, supra,* the Supreme Court of the United States considered factors very similar to these in declaring valid a statute which ordered the summary destruction of fishing nets, which like the signs, are objects subject to legal use. The case involved a statute for the preservation of fisheries which declared nets and other fishing objects found in or upon certain waters to be a public nuisance. The Supreme Court stated:

---

[8] See footnote 4. According to an inventory of signs carried out by the Planning Board from January to April 1961, there were, at least, 629 advertisements in violation of the act.

[9] It was thus admitted by appellees during the hearing before this Court.

"The legislature, however, undoubtedly possessed the power not only to prohibit fishing by nets in these waters, but to make it a criminal offense, and to take such measures as were reasonable and necessary to prevent such offenses in the future. It certainly could not do this more effectually than by destroying the means of the offense. *If the nets were being used in a manner detrimental to the interests of the public, we think it was within the power of the legislature to declare them to be nuisances, and to authorize the officers of the State to abate them." Id.* 139. (Italics ours.)

With respect to the argument that the nets were not a nuisance per se but were used for a lawful purpose, the Supreme Court stated:

"Many articles, such, for instance, as cards, dice, and other articles used for gambling purposes, are perfectly harmless in themselves, but may become nuisances by being put to an illegal use, and in such cases fall within the ban of the law and may be summarily destroyed. It is true that this rule does not always follow from the illegal use of a harmless article. A house may not be torn down because it is put to an illegal use, since it may be as readily used for a lawful purpose, . . . but where minor articles of personal property are devoted to such use the fact that they may be used for a lawful purpose would not deprive the legislature of the power to destroy them. The power of the legislature to declare that which is perfectly innocent in itself to be unlawful is beyond question . . . , and in such case the legislature may annex to the prohibited act all the incidents of a criminal offense, including the destruction of property denounced by it as a public nuisance." *Id.* 142.

The Federal Supreme Court held the validity of the summary procedure on the following grounds: a) the little value of the nets, b) the difficulty of removing them from the water, c) risks and cost of removal, and, d) the fact that the efficacy of the statute would be seriously impaired if an ordinary judicial proceeding were required. Moreover, although the statute in question did not prescribe it, it took into consideration that the persons affected were not deprived of rem-

56

edy but they could replevy the nets or their value from the officers seizing them. As we have previously seen, our statute provides a greater protection to property rights of affected persons, since it expressly establishes an action for damages by which the recovery of the damages may be obtained and not merely the value of the signs.

Summing up, in view of the effort of more than half a century of the Legislature to attain an effective remedy for the abatement of signs and advertisements unlawfully installed, of the fact that the property rights of affected persons are protected at length, and of the nature of the nuisance, we conclude that the summary procedure established in Act No. 5 of September 28, 1961, complies altogether with the guarantees of the due process of law.

The judgment rendered by the trial court will be reversed and another rendered upholding the constitutionality of Act No. 5 of September 28, 1961.

Mr. Chief Justice Luis Negrón Fernández did not participate herein.