BERMAN ET AL., EXECUTORS, *v.* PARKER ET AL.

No. 22. Argued October 19, 1954.—Decided November 22, 1954.

*James C. Toomey* and *Joseph H. Schneider* argued the cause for appellants.  With them on the brief was *Albert Ginsberg.*

*Solicitor General Soboloff* argued the cause for appellees. *Assistant Attorney General Morton, Oscar H. Davis, Roger P. Marquis, George F. Riseling* and *William S. Cheatham* were with him on a brief for the District of Columbia Redevelopment Land Agency and the National Capital Planning Commission, appellees.

*Vernon E. West, Chester H. Gray, Milton D. Korman, Harry L. Walker* and *J. Hampton Baumgartner, Jr.* filed a brief for Renah F. Camalier and Louis W. Prentiss, Commissioners of the District of Columbia, appellees.

28

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is an appeal (28 U. S. C. § 1253) from the judgment of a three-judge District Court which dismissed a complaint seeking to enjoin the condemnation of appellants' property under the District of Columbia Redevelopment Act of 1945, 60 Stat. 790, D. C. Code, 1951, §§ 5-701–5-719. The challenge was to the constitutionality of the Act, particularly as applied to the taking of appellants' property. The District Court sustained the constitutionality of the Act. 117 F. Supp. 705.

By § 2 of the Act, Congress made a "legislative determination" that "owing to technological and sociological changes, obsolete lay-out, and other factors, conditions existing in the District of Columbia with respect to substandard housing and blighted areas, including the use of buildings in alleys as dwellings for human habitation, are injurious to the public health, safety, morals, and welfare; and it is hereby declared to be the policy of the United States to protect and promote the welfare of the inhabitants of the seat of the Government by eliminating all such injurious conditions by employing all means necessary and appropriate for the purpose." *

Section 2 goes on to declare that acquisition of property is necessary to eliminate these housing conditions.

---

*The Act does not define either "slums" or "blighted areas." Section 3 (r), however, states:

" 'Substandard housing conditions' means the conditions obtaining in connection with the existence of any dwelling, or dwellings, or housing accommodations for human beings, which because of lack of sanitary facilities, ventilation, or light, or because of dilapidation, overcrowding, faulty interior arrangement, or any combination of these factors, is in the opinion of the Commissioners detrimental to the safety, health, morals, or welfare of the inhabitants of the District of Columbia."

Congress further finds in § 2 that these ends cannot be attained "by the ordinary operations of private enterprise alone without public participation"; that "the sound replanning and redevelopment of an obsolescent or obsolescing portion" of the District "cannot be accomplished unless it be done in the light of comprehensive and coordinated planning of the whole of the territory of the District of Columbia and its environs"; and that "the acquisition and the assembly of real property and the leasing or sale thereof for redevelopment pursuant to a project area redevelopment plan . . . is hereby declared to be a public use."

Section 4 creates the District of Columbia Redevelopment Land Agency (hereinafter called the Agency), composed of five members, which is granted power by § 5 (a) to acquire and assemble, by eminent domain and otherwise, real property for "the redevelopment of blighted territory in the District of Columbia and the prevention, reduction, or elimination of blighting factors or causes of blight."

Section 6 (a) of the Act directs the National Capital Planning Commission (hereinafter called the Planning Commission) to make and develop "a comprehensive or general plan" of the District, including "a land-use plan" which designates land for use for "housing, business, industry, recreation, education, public buildings, public reservations, and other general categories of public and private uses of the land." Section 6 (b) authorizes the Planning Commission to adopt redevelopment plans for specific project areas. These plans are subject to the approval of the District Commissioners after a public hearing; and they prescribe the various public and private land uses for the respective areas, the "standards of population density and building intensity," and "the amount or character or class of any low-rent housing." § 6 (b).

Once the Planning Commission adopts a plan and that plan is approved by the Commissioners, the Planning Commission certifies it to the Agency. § 6 (d). At that point, the Agency is authorized to acquire and assemble the real property in the area. *Id.*

After the real estate has been assembled, the Agency is authorized to transfer to public agencies the land to be devoted to such public purposes as streets, utilities, recreational facilities, and schools, § 7 (a), and to lease or sell the remainder as an entirety or in parts to a redevelopment company, individual, or partnership. § 7 (b), (f). The leases or sales must provide that the lessees or purchasers will carry out the redevelopment plan and that "no use shall be made of any land or real property included in the lease or sale nor any building or structure erected thereon" which does not conform to the plan, §§ 7 (d), 11. Preference is to be given to private enterprise over public agencies in executing the redevelopment plan. § 7 (g).

The first project undertaken under the Act relates to Project Area B in Southwest Washington, D. C. In 1950 the Planning Commission prepared and published a comprehensive plan for the District. Surveys revealed that in Area B, 64.3% of the dwellings were beyond repair, 18.4% needed major repairs, only 17.3% were satisfactory; 57.8% of the dwellings had outside toilets, 60.3% had no baths, 29.3% lacked electricity, 82.2% had no wash basins or laundry tubs, 83.8% lacked central heating. In the judgment of the District's Director of Health it was necessary to redevelop Area B in the interests of public health. The population of Area B amounted to 5,012 persons, of whom 97.5% were Negroes.

The plan for Area B specifies the boundaries and allocates the use of the land for various purposes. It makes detailed provisions for types of dwelling units and provides that at least one-third of them are to be low-rent

housing with a maximum rental of $17 per room per month.

After a public hearing, the Commissioners approved the plan and the Planning Commission certified it to the Agency for execution. The Agency undertook the preliminary steps for redevelopment of the area when this suit was brought.

Appellants own property in Area B at 712 Fourth Street, S. W. It is not used. as a dwelling or place of habitation. A department store is located on it. Appellants object to the appropriation of this property for the purposes of the project. They claim that their property may not be taken constitutionally for this project. It is commercial, not residential property; it is not slum housing; it will be put into the project under the management of a private, not a public, agency and redeveloped for private, not public, use. That is the argument; and the contention is that appellants' private property is being taken contrary to two mandates of the Fifth Amendment—(1) "No person shall . . . be deprived of . . . property, without due process of law"; (2) "nor shall private property be taken for public use, without just compensation." To take for the purpose of ridding the area of slums is one thing; it is quite another, the argument goes, to take a man's property merely to develop a better balanced, more attractive community. The District Court, while agreeing in general with that argument, saved the Act by construing it to mean that the Agency could condemn property only for the reasonable necessities of slum clearance and prevention, its concept of "slum" being the existence of conditions "injurious to the public health, safety, morals and welfare." 117 F. Supp. 705, 724–725.

The power of Congress over the District of Columbia includes all the legislative powers which a state may exercise over its affairs. See *District of Columbia* v. *Thomp-*

*son Co.*, 346 U. S. 100, 108. We deal, in other words, with what traditionally has been known as the police power. An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determinations addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition. Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia (see *Block* v. *Hirsh*, 256 U. S. 135) or the States legislating concerning local affairs. See *Olsen* v. *Nebraska*, 313 U. S. 236; *Lincoln Union* v. *Northwestern Co.*, 335 U. S. 525; *California State Association* v. *Maloney*, 341 U. S. 105. This principle admits of no exception merely because the power of eminent domain is involved. The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one. See *Old Dominion Co.* v. *United States*, 269 U. S. 55, 66; *United States ex rel. T. V. A.* v. *Welch*, 327 U. S. 546, 552.

Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it. See *Noble State Bank* v. *Haskell*, 219 U. S. 104, 111. Miserable and disreputable housing conditions may do more than spread disease and crime and immorality. They may also suffocate the spirit by reducing the people who live there to the status of cattle. They may indeed make living an almost insufferable burden. They may also be an ugly sore, a blight on the community which robs it of charm,

which makes it a place from which men turn. The misery of housing may despoil a community as an open sewer may ruin a river.

We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. See *Day-Brite Lighting, Inc.* v. *Missouri,* 342 U. S. 421, 424. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation's Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way.

Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end. See *Luxton* v. *North River Bridge Co.,* 153 U. S. 525, 529–530; *United States* v. *Gettysburg Electric R. Co.,* 160 U. S. 668, 679. Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established. See *Luxton* v. *North River Bridge Co., supra;* cf. *Highland* v. *Russell Car Co.,* 279 U. S. 253. The public end may be as well or better served through an

agency of private enterprise than through a department of government—or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects. What we have said also disposes of any contention concerning the fact that certain property owners in the area may be permitted to repurchase their properties for redevelopment in harmony with the over-all plan. That, too, is a legitimate means which Congress and its agencies may adopt, if they choose.

In the present case, Congress and its authorized agencies attack the problem of the blighted parts of the community on an area rather than on a structure-by-structure basis. That, too, is opposed by appellants. They maintain that since their building does not imperil health or safety nor contribute to the making of a slum or a blighted area, it cannot be swept into a redevelopment plan by the mere dictum of the Planning Commission or the Commissioners. The particular uses to be made of the land in the project were determined with regard to the needs of the particular community. The experts concluded that if the community were to be healthy, if it were not to revert again to a blighted or slum area, as though possessed of a congenital disease, the area must be planned as a whole. It was not enough, they believed, to remove existing buildings that were insanitary or unsightly. It was important to redesign the whole area so as to eliminate the conditions that cause slums—the overcrowding of dwellings, the lack of parks, the lack of adequate streets and alleys, the absence of recreational areas, the lack of light and air, the presence of outmoded street patterns. It was believed that the piecemeal approach, the removal of individual structures that were offensive, would be only a palliative. The entire area needed redesigning so that a balanced, integrated plan could be developed for the region, including not only new homes

but also schools, churches, parks, streets, and shopping centers. In this way it was hoped that the cycle of decay of the area could be controlled and the birth of future slums prevented. Cf. *Gohld Realty Co.* v. *Hartford,* 141 Conn. 135, 141–144, 104 A. 2d 365, 368–370; *Hunter* v. *Redevelopment Authority,* 195 Va. 326, 338–339, 78 S. E. 2d 893, 900–901. Such diversification in future use is plainly relevant to the maintenance of the desired housing standards and therefore within congressional power.

The District Court below suggested that, if such a broad scope were intended for the statute, the standards contained in the Act would not be sufficiently definite to sustain the delegation of authority. 117 F. Supp. 705, 721. We do not agree. We think the standards prescribed were adequate for executing the plan to eliminate not only slums as narrowly defined by the District Court but also the blighted areas that tend to produce slums. Property may of course be taken for this redevelopment which, standing by itself, is innocuous and unoffending. But we have said enough to indicate that it is the need of the area as a whole which Congress and its agencies are evaluating. If owner after owner were permitted to resist these redevelopment programs on the ground that his particular property was not being used against the public interest, integrated plans for redevelopment would suffer greatly. The argument pressed on us is, indeed, a plea to substitute the landowner's standard of the public need for the standard prescribed by Congress. But as we have already stated, community redevelopment programs need not, by force of the Constitution, be on a piecemeal basis—lot by lot, building by building.

It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a par-

ticular tract to complete the integrated plan rests in the discretion of the legislative branch. See *Shoemaker* v. *United States,* 147 U. S. 282, 298; *United States ex rel. T. V. A.* v. *Welch, supra,* 554; *United States* v. *Carmack,* 329 U. S. 230, 247.

The District Court indicated grave doubts concerning the Agency's right to take full title to the land as distinguished from the objectionable buildings located on it. 117 F. Supp. 705, 715–719. We do not share those doubts. If the Agency considers it necessary in carrying out the redevelopment project to take full title to the real property involved, it may do so. It is not for the courts to determine whether it is necessary for successful consummation of the project that unsafe, unsightly, or insanitary buildings alone be taken or whether title to the land be included, any more than it is the function of the courts to sort and choose among the various parcels selected for condemnation.

The rights of these property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts as the price of the taking.

The judgment of the District Court, as modified by this opinion, is

*Affirmed.*