254 A.2d 426.

DOMENICK J. ROMEO *et ux. vs.* CRANSTON REDEVELOPMENT
AGENCY *et al.*

JUNE 12, 1969.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

652

KELLEHER, J. This is a civil action wherein the plaintiffs seek to enjoin the Cranston Redevelopment Agency and the city of Cranston from proceeding with an urban renewal project which had been approved by the city council. The case was heard by a justice of the superior court on an agreed statement of facts. Certain municipal records relating to the project were made part of the record. A judgment was entered denying and dismissing the complaint. The plaintiffs then prosecuted the instant appeal.

The Cranston Redevelopment Agency is a public body "corporate and politic" which is charged with the responsibility of preparing and executing plans for the redevelopment within the city of blighted and substandard areas as that phrase is further defined and delineated in the Redevelopment Act of 1956. On January 22, 1968, the Cranston city council enacted an ordinance which approved and adopted a proposal submitted to it by the agency which has as one of its ultimate goals the establishment of an industrial park or development in the southeasterly section of the municipality.

The project calls for the acquisition by the agency of a 14½-acre tract of land which lies south of Park Avenue, west of Mill Street, east of Elmwood Avenue and north of the Pawtuxet River. Within this area there are 145 parcels of land which the agency would acquire by direct negotiation or by its use of the power of eminent domain. The agency would be responsible for the construction through this land of a highway to be known as Bellefont Industrial Drive and the installation thereon and thereunder of various utilities comprising water, sewer, drainage, gas, electric, telephone, street lighting and appurtenances. The road would run in a somewhat general southwesterly direction from Park Avenue to Elmwood Avenue and would assist in the orderly development of this particular area of Cranston.

The plaintiffs' home is within the project area. In addition, they are the joint owners of 11 parcels of vacant land which are also included within the redevelopment plan. They challenge the council's approval of the agency's plan on grounds that the enabling legislation is unconstitutional and, that if it is constitutional, the council's actions were illegal because of a failure by the Cranston officials to comply with certain statutory requirements.

## The Constitutional Issue

Article XXXIII of the Rhode Island Constitution provides that the replanning, redevelopment, rehabilitation and improvement of "blighted and substandard areas" shall be a public use and purpose for which the power of eminent domain may be exercised and public credit pledged. General Laws 1956, §45-31-8(2) declares that the term "Blighted and substandard area" shall include within its meaning a "slum blighted area," a "deteriorated blighted area" or an "arrested blighted area" or any combination of any such areas. The statute then goes on to define each of the three phrases. The legislature describes an "arrested blighted area" as follows:

> "(5) 'Arrested blighted area' means any area which by reason of the existence of physical conditions including, but not by way of limitation, the existence of unsuitable soil conditions, the existence of dumping or other insanitary or unsafe conditions, the existence of ledge or rock, the necessity of unduly expensive excavation, fill or grading, or the necessity of undertaking unduly expensive measures for the drainage of the area or for the prevention of flooding thereof or for making the same appropriate for sound development, or by reason of obsolete, inappropriate or otherwise faulty platting or subdivision, deterioration of site improvements, inadequacy of utilities, diversity of ownership of plots, or tax delinquencies, or by reason of any combination of any of the foregoing conditions, is unduly costly to develop soundly through the ord-

inary operations or private enterprise and impairs the sound growth of the community."

The defendant redevelopment agency employed the criteria[1] set forth above when it designated the area for the proposed industrial drive. In making their constitutional challenge, plaintiffs point out that the legislative definition of an "arrested blighted area" fails to contain any requirement that the conditions set forth therein constitute a menace to the public health, safety or welfare. In essence they contend that such an omission is fatal because this section allows the expenditure of public money and the taking of property by eminent domain for a nonpublic purpose. The plaintiffs argue that unless the legislature declares that the conditions it has enumerated as constituting an "arrested blighted area" are deleterious to the public health, safety and welfare, their eradication does not constitute a public use whereby property may be condemned by the power of eminent domain.

The plaintiffs buttress their charge of unconstitutionality by citing generous portions of an advisory opinion given by the justices of this court to the governor in 1949. See *Opinion to the Governor*, 76 R. I. 249, 69 A.2d 531. That opinion was given as a result of the chief executive's concern relative to the constitutionality of various portions of legislation originally enacted by the general assembly in 1946 and known as the Community Redevelopment Act. This statute was the first effort by the legislature to enable the various municipalities in Rhode Island to undertake a program of urban renewal and redevelopment. Two of the then justices of this court upheld the taking of blighted property which was "conducive to ill health, transmission of disease, infant mortality, juvenile delinquency and

---

[1]The following conditions were expressly found to be existing within the project area: obsolete platting, inadequacy of utilities, diversity of ownership of lots, title to numerous lots held by reason of their sale for delinquent taxes, and the dumping of refuse and perishables in the area.

crime" for private development but so interpreted the statute as to deny the right to take stagnant unproductive land which might be more useful and remunerative to a community but which in and of itself was not inimical to the public welfare. One justice told the governor that he had serious misgivings about different sections of the act but was unprepared to state flatly that the legislation was unconstitutional. The other two justices had no doubts whatever. They informed the chief executive that the act was patently unconstitutional. They did not believe that it was constitutionally permissible to condemn a person's property and then sell it to a private redeveloper.

In charging that the statutory definition of an "arrested blighted area" is unconstitutional, plaintiffs overlook three very important factors. First, while an advisory opinion rendered by this court is entitled to respect, it is advisory only, and without weight as legal precedent. *Opinion to the House of Representatives, 99 R. I. 377, 208 A.2d 126.* Secondly, in 1955, some six years after the advisory opinion on the Community Redevelopment Act, a constitutional convention was held and thereafter the people went to the polls and gave emphatic approval to an amendment to the state constitution. The amendment is known and cited as Article XXXIII (see Appendix). Finally, when plaintiffs claim that the questioned definition contains no reference to the public health, safety and welfare, they have ignored the provisions of §45-31-3. There the legislature has made eight specific findings as to the dangers which ensue from the existence in Rhode Island of blighted and substandard areas. We shall quote only the first finding:

> "It is further found (a) that the existence of blighted and substandard areas constitutes a serious and growing menace which is injurious and inimical to the public health, safety, morals and welfare of the people of the communities in which they exist and of the people of the state generally * * *."

While the setting forth of this legislative finding might ease plaintiffs' concern over the absence of language relating to the public health, safety and welfare, in the definition which is presently before us, we think it better to discuss at some length the reasons why we believe that plaintiffs' constitutional challenge is unwarranted.

It is common knowledge that after the 1949 advisory opinion and the holding in *Ajootian* v. *Providence Redevelopment Agency*, 80 R. I. 73, 91 A.2d 21,[2] where the court adhered to the various opinions previously expressed to the governor, an effort was initiated by certain concerned citizens, officials of many municipalities in this state, and various civic organizations, to remove all constitutional doubts relative to an establishment of a program for urban renewal so that a combination of public and private enterprise could be used to make many of the cities of this state livable and vital communities.

Furthermore, the two justices who gave their qualified approval to the Community Redevelopment Act took pains to point out that they were not holding that a redevelopment agency could engage in a project based mainly on aesthetic views or upon considerations of any economic advantage to the municipality or a combination of both. The justices then went on and at page 256 of the advisory opinion conceded that the act might have been given a much broader construction and application than the one given if it had been enacted under an appropriate constitutional amendment. In our opinion, the people in adopting the redevelopment amendment accepted the justices' suggestions and signified their desire that urban

---

[2] *Ajootian* was a three-to-two decision. The undecided judge in the advisory opinion joined forces with the two judges who had previously expressed their approval of the slum clearance provision of the Community Redevelopment Act. The other two justices still maintained that it was unconstitutional to take a man's property by eminent domain and then sell it to a third person.

renewal be permitted to attain its full fruition—not only the elimination of slums but the eradiction of blight which is usually the precursor of slums, with their potentiality as sources of disease.

An analysis of the various opinions given by our predecessors in 1949 reveals that they viewed the phrase "public use" in what was then the traditional sense, *i.e.*, the prospective use of the property taken from private persons must provide the general public, or an appreciable portion thereof, with the right to use or employ such property or at least have it used or employed by some agency, public or private in the public interest under appropriate regulations and restrictions in order to provide the public as such with some service deemed to be necessary to it or to a proper function of government.

Today, however, we live in a different age and it is our belief that a public use may not be given a rigid, unbending, absolute definition. In the everchanging conditions of our modern society, new advances in the fields of sciences, new concepts in the scope and function of government and other circumstances make it clear that the former concept as to what is a public use has undergone a great change. Views as to what constitutes a public use necessarily vary with the changing conceptions of the scope and functions of government so that today there are familiar examples of such use which years ago would be unheard of. As governmental activities and services increased with the growing demands of society, the concept of "public use" has broadened in proportion thereto. The modern trend of authority is to expand and liberally construe the meaning of "public use." *Katz v. Brandon,* 156 Conn. 521, 245 A.2d 579.

During the last century, courts attached a very literal meaning to the phrase "public use." Land taken by eminent domain for parks, water resources, railroads, highways,

schools and public utilities was held to qualify under the phrase. It has only been in comparatively recent times that courts, having become aware of the needs of an urban society, have departed from viewing the words "public use" in the narrow sense which had formerly won wide acceptance. Today, respectable and substantial authority rejects the traditional view that a public use contemplated that the public have a right to a definite and fixed use in the property taken irrespective of the will of the one in whom title is vested. Such a restricted view is completely unrealistic when juxtaposed against present-day urban needs. The urban renewal statutes of the various states have been enacted in response to the Housing Act of 1949 (63 Stat. 413, chap. 338, 81st Congress, 42 U.S.C.A. §1441 et seq.). This legislation called for a wider application of the generally accepted principle that private property might be acquired for the clearance of slums and the subsequent construction of housing thereon. The new act afforded the necessary federal funds to initiate a new program whereby property could be acquired and redeveloped for commercial and industrial purposes. The various statutes which have been promulgated and which authorized the taking of private property for subsequent redevelopment as an industrial complex by private enterprise have been upheld in all but three states.[3] Six states deemed it necessary to amend their constitutions before the statute was subjected to judicial scrutiny. Most courts, however, held the law valid on a theory which took a different view of the tradi-

---

[3]*Adams* v. *Housing Authority,* (Fla.) 60 So.2d 663; *Housing Authority* v. *Johnson,* 209 Ga. 560, 74 S.E.2d 891; *Edens* v. *City of Columbia,* 228 S. C. 563, 91 S.E.2d 280.

The *Adams* case seems to have been impliedly overruled in *Grubstein* v. *Urban Renewal Agency,* (Fla.) 115 So.2d 745, which held urban renewal constitutional at least to the extent that it contemplated the elimination of slums, as distinguished from blighted areas. The *Johnson* case was overruled by a constitutional amendment.

tional concept of a public use. They reasoned that the acquisition itself was a public use since the acquisition and clearance eliminated slum and blight and that the future use of this property by private developers was incidental to the attainment of the public purpose. See Note, *Scope of Judicial Review in Urban Renewal Litigation*: 17 Vanderbilt L. R. 1235 and 44 A.L.R.2d 1416 together with its Later Case Service.

Perhaps the single greatest contribution to the expanded view of a public use came in 1954 with the holding of the United States Supreme Court in the case of *Berman* v. *Parker*, 348 U. S. 26, 75 S.Ct. 98, 99 L.Ed. 27. There certain property owners challenged the constitutionality of a District of Columbia enabling act passed by Congress which was designed to aid in the elimination of substandard housing and blighted areas. They claimed that their rights under the Fifth Amendment were being violated because their property was not substandard and that its taking was for a private rather than a public use.

The Supreme Court rejected both contentions. It analogized the power of Congress in supervising the District of Columbia to the power of a state legislature when enacting laws which relate to the internal affairs of a state. *Id.*, at 32, 75 S. Ct. at 102, 99 L.Ed. at 37, where the court stated:

> "Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation * * *. The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one."

The court then took a contemporary view as to what constitutes a public use. The Supreme Court, in what could

be deemed a reply to the various opinions expressed by the justices of this court in 1949, declared:

> "We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. (citations omitted) The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled."

The *Berman* decision was published in November 1954. Six months later, the Rhode Island constitutional convention convened. The electorate adopted Article XXXIII on July 15, 1955. By so doing, the people made it unmistakably clear that it was to be the sovereign law of this state that the redevelopment and rehabilitation of "blighted and substandard areas [would constitute] a public use and purpose." The plaintiffs here, however, in effect urge that the phrase "blighted and substandard area" should be given the same restrictive interpretation as was given the term "blighted area" by the former members of this court when they construed the Community Redevelopment Act 20 years ago. The question then is whether the people in approving Article XXXIII intended that the phrase "blighted and substandard area" be given the same restrictive interpretation as our predecessors in 1949 gave to the term "blighted area." The answer, we believe, is obvious—they did not.

It is our considered judgment that those who went to the polls in July 1955 and approved Article XXXIII had two things in mind. It was their desire that the traditional concept of a public use not be applied by the judiciary when it reviewed any renewal or redevelopment project which might be undertaken in this state. Secondly, the citizens intended that a broad mandate be given to the various redevelopment agencies in their efforts to renew, revitalize

and rehabilitate many of the municipalities in Rhode Island. The public in 1955 had been made well aware by the various news media of the meaning given to the term "blighted area" in the earlier redevelopment act. There a blighted area included within its description open and stagnant land which was in need of reclamation. We believe that the people when they endorsed the language of the constitutional amendment now before us signified a desire that all the tools which are contained in an urban renewal kit should be made available for the refurbishing of all the blighted areas described by the legislature in 1946 but which, in the opinion of the justices of this court, were denied the use of public money because the land in question was not a menace to the public health, safety and welfare.

We are aware that doubt has been expressed in other states that many of the conditions alluded to in our definition of an "arrested blighted area" touch upon a public use. See *Randolph* v. *Wilmington Housing Authority*, 37 Del. Ch. 202, 139 A.2d 476; *Crommett* v. *City of Portland*, 150 Me. 217, 107 A.2d 841; *Miller* v. *City of Tacoma*, 61 Wash.2d 374, 378 P.2d 464. However, *Cannata* v. *City of New York*, 11 N.Y.2d 210, 182 N.E.2d 395, upheld the constitutionality of the statute which permitted the reclamation and redevelopment of predominantly vacant areas which are economically dormant. Many of the conditions set forth in the statute are identical with those contained in §45-31-8. The Massachusetts Supreme Court in *Opinion of the Justices*, 334 Mass. 760, 135 N.E.2d 665, declared that redevelopment on a "blighted open area" was a public use. The Massachusetts statutory definition is comparable to ours. In *Wilson* v. *Long Branch*, 27 N. J. 360, 142 A.2d 837, an act whose definition of a blighted area contained several of the criteria set forth in our definition of an "arrested blighted area" was held to be constitutional.

Here we cannot fault the general assembly's definition

of an "arrested blighted area." While we recognize that it is the exclusive function of the judiciary to interpret the language of our state's constitution, it is our belief that the legislature has remained well within its field of competence when it delineated the areas which would qualify for relief by the redevelopment powers enumerated in our constitution. The general assembly in defining an arrested blighted area has set forth numerous conditions which if left unchecked can turn an area into a wasteland. In *People ex rel. Gutknecht* v. *City of Chicago*, 3 Ill.2d 539, 121 N.E.2d 791, 795 the court declared that "* * * we are aware of no constitutional principle which paralyzes the power of government to deal with an evil until it has reached its maximum development." So, too, we believe that the redevelopment of an arrested blighted area is a device somewhat akin to the surgeon's scalpel. As the surgeon wields his scalpel to prevent a condition from further imperiling the well-being of his patient, a redevelopment agency may initiate a project in an arrested blighted area which may be compared to preventive surgery. As the doctor is concerned with the revitalization of his patient, the redevelopment agency's goal is the revitalization of the community.

In *Wilson* v. *Long Branch, supra,* at 370, 142 A.2d at 842, there appears the following passage which we deem quite appropriate to the issue now before us:

> "Community redevelopment is a modern facet of municipal government. Soundly planned redevelopment can make the difference between continued stagnation and decline and a resurgence of healthy growth. It provides the means of removing the decadent effect of slums and blight on neighboring property values, of opening up new areas for residence and industry. In recent years, recognition has grown that governing bodies must either plan for the development or redevelopment of urban areas or permit them to become more congested, deteriorated, obsolescent, unhealthy, stagnant, inefficient and costly. * * * Even if there were

no express constitutional sanction for redevelopment of the type described in our statute, ample authority to do so might be found in the well of police power. Manifestly, the purposes to be served are intimately related to the public health, welfare and safety and so are consonant with both Federal and State Constitutions."

We therefore hold that the clearance, replanning, redevelopment, rehabilitation and improvement of an "arrested blighted area" as that term is set forth in the statute constitutes a public use and is constitutionally permissible.

The plaintiffs take nothing when, in the final phase of their constitutional attack, they claim the description of the Bellefont Industrial Park project site is invalid because their property which is within the site is not blighted and in fact the bulk of it consists of vacant land already zoned industrial. It has been held repeatedly that the fact some land in a blighted area is vacant or contains buildings which are structurally sound and in good repair, does not invalidate the eminent domain proceedings. It is not necessary that every parcel of real estate acquired be in a blighted condition before the entire area can be condemned. It is sufficient that the taking as a whole is reasonably necessary to the attainment of the legislative purpose. The constitution and the legislature speak of areas not individual properties. *Lyons* v. *Camden*, 48 N. J. 524, 226 A.2d 625; *Velishka* v. *City of Nashua*, 99 N. H. 161, 106 A.2d 571; *Oliver* v. *City of Clairton*, 374 Pa. 333, 98 A.2d 47; Anno., *Urban Redevelopment Laws*: 44 A.L.R.2d 1414; 4 A.L.R.2d, *Later Case Service* 991-993.

While we endorse the language in *Berman* which declares that the legislature is the prime protector of the public needs to be served by legislation, we do not intend our endorsement as to be considered a retreat in any degree from our previous declarations made on this subject. In *City of Newport* v. *Newport Water Corp.*, 57 R. I. 269, 189 A. 843,

we repeated the well-established rule that what constitutes a public use is a judicial question, but the necessity and expediency of a taking for a public use is a legislative question with which the courts have nothing to do.

We do not, however, regard this statement as being absolute and unqualified. In *Balsamo* v. *Providence Redevelopment Agency*, 84 R. I. 323, 124 A.2d 238, we purposely left open the question of whether or not a property owner's claim that a redevelopment agency had exceeded its statutory authority was a proper subject for judicial review. Conscious as we are of the extreme grant of power now resting in the hands of various redevelopment agencies functioning within this state, we believe that a showing that a redevelopment agency has exceeded its delegated authority by an arbitrary, capricious or bad faith taking of private property is a matter properly cognizable by the judicial branch. See *Gohld Realty Co.* v. *City of Hartford*, 141 Conn. 135, 104 A.2d 365; *Kaskel* v. *Impellitteri*, 306 N. Y. 73, 115 N.E.2d 659. This declaration is of no help to plaintiffs for there is no evidence in the record which shows that defendants acted unreasonably when they included plaintiffs' property within the Bellefont project area.

The plaintiffs' attack on the constitutionality of the legislative definition of a substandard and blighted area fails.

The Illegality of the Defendants' Actions

In urging that the city's approval of the Bellefont Park project is illegal, plaintiffs point to the provisions of G. L. 1956, §45-32-7, which reads as follows:

"All redevelopment plans shall be submitted to the legislative body by the redevelopment agency. Every redevelopment plan shall conform to the master or general community plan insofar as the latter applies to the redevelopment area. The agency shall consult with the planning commission of the community in formulating redevelopment plans before their submission to the legislative body. Whenever a redevelopment plan is submitted to the legislative body, a copy

thereof shall be submitted to the planning commission which shall report to the legislative body within thirty (30) days on the redevelopment plan and its conformity to the master or general plan of the community."

The plaintiffs contend that the Bellefont Industrial Park project does not conform to the Cranston master plan and that the agency did not consult with the Cranston Planning Commission before the plans in dispute were presented to the city council. All the parties concede that the planning commission did not render its report relative to the agency's proposal within the 30-day period set forth in the statute.

In the record is a letter from the Cranston Planning Commission dated January 22, 1968, wherein it informs the city council that the Bellefont project conforms to the city's master plan. An examination of the agreed statement of facts shows that a joint special meeting of the planning commission and the redevelopment agency was held on Wednesday, August 4, 1965. The conference concerned the proposed Bellefont Industrial Park. It is further agreed that the executive director of the redevelopment agency and the city planning director conferred on several occasions on this project. Section 45-32-5 of the General Laws gives a redevelopment agency the authority to select officers, agents and counsel. Sections 13.01 and 13.02 of the Cranston City Charter provide that the city's planning commission shall hire a director who shall direct all activities of the staff. The charter provisions we have referred to were validated by the legislature in 1963. It is obvious therefore that the general assembly contemplated that consultations which transpire between a planning commission and a redevelopment agency would be conducted by the appropriate personnel hired by the respective agencies.

The trial justice found as a fact that there was consultation between the two municipal agencies and that the proposed industrial project did not violate the city's master plan. It is well settled that findings of fact made by a trial

justice will not be upset unless clearly wrong. The evidence here certainly supports the superior court's finding.

Likewise, we concur with the trial justice's conclusion that the failure of the planning commission to communicate its sentiments relative to the proposed Bellefont project to the council within 30 days does not invalidate the council's action. In our opinion the provision relating to the 30-day time period is purely directory.

In determining whether the 30-day requirement is an indispensable element within the legislative process of initiating a redevelopment project, we need only look to certain provisions of chap. 32, of title 45. We can find nothing in the redevelopment act which nullifies the power of a planning commission to submit its report at any time after the expiration of the time limit set forth in §45-32-7. There is no penalty set forth, nor has the general assembly seen fit to specify what the consequences would be should the planning commission fail to make a report within the 30-day period. In fact, §45-32-12 provides that at a public hearing on the plan, a local legislature or the appointed committee thereof "* * * shall consider the plan and report, *if any,* of the planning commission * * *." It is obvious that in enacting this provision the general assembly envisioned instances where a planning commission might not make any report. As was so aptly pointed out by the trial justice, if one considered the 30-day limit as being mandatory in nature, such a view would give a planning commission an absolute veto power over any and all projects formulated by a redevelopment agency, thus depriving a local legislative body of its statutory authority. Such a view is completely unrealistic. We therefore hold that the planning commission's failure to file its report within the 30 days set forth in the statute did not vitiate the council's action in approving the Bellefont Industrial Park Project.

In their brief, the plaintiffs also complain that the Cranston Planning Commission did not render a "report" as contemplated by the requirements of §45-32-7. This contention is not properly before us for the reason that this issue was not pursued in the trial court. As we said in *Spouting Rock Beach Ass'n* v. *Garcia,* 104 R. I. 451, 244 A.2d 871, the only questions entitled to review in this court are those raised in the court below. We will not therefore consider this issue.

. The plaintiffs' appeal is denied and dismissed and the judgment appealed from is affirmed.

## Appendix

### ARTICLE XXXIII

#### Redevelopment Powers

"§1. Redevelopment powers. — The clearance, replanning, redevelopment, rehabilitation and improvement of blighted and substandard areas shall be a public use and purpose for which the power of eminent domain may be exercised, tax moneys and other public funds expended and public credit pledged. The general assembly may authorize cities, towns, or local redevelopment agencies to undertake and carry out projects approved by the local legislative body for such uses and purposes including (a) the acquisition in such areas of such properties as the local legislative body may deem necessary or proper to effectuate any of the purposes of this article, although temporarily not required for such purposes, and (b) the sale or other disposition of any such properties to private persons for private uses or to public bodies for public uses."

*Richard M. Casparian,* for plaintiffs.

*Herbert J. Abedon,* for Cranston Redevelopment Agency, *Peter Palombo, Jr.,* City Solicitor, for City of Cranston, for defendants.