Julia Eliza **GRIFFIN**

v.

Robert **BENDICK**, Director of the Department of Environmental Management,

and

W. Edward **Wood**, Director of the Department of Transportation.

No. 80–26–Appeal.

Supreme Court of Rhode Island.

Aug. 4, 1983.

Norman L. Grant, Pawtucket, for plaintiff.

Dennis J. Roberts, II, Atty. Gen., Charles McKinley, Sp. Asst. Atty. Gen., for defendants.

## OPINION

KELLEHER, Justice.

The roots of this dispute lie in the now decades-old condemnation of certain lands owned by the plaintiff, Julia Eliza Griffin

(Griffin). The parcels, located along the shoreline of the town of Narragansett, were taken and compensated for by the state in a series of condemnation proceedings that took place in the years 1946 and 1962. Griffin's land was condemned for the ostensible purpose of developing a state port facility. Sometime in 1972 Griffin concluded that she had been aggrieved by these condemnations, and she subsequently filed this Superior Court civil action on January 9, 1973. In her prayers for declaratory relief, Griffin requested the court to award her damages, to reinvest her with title to the properties, and to account for all rentals and fees collected.

Following trial before a justice sitting without a jury, both parties took appeals to this court. Upon a review of the record, we are of the opinion that this controversy raises salient constitutional issues that should be addressed at this time, although the case might be dismissed on other grounds as discussed below. Given the course of action we have chosen to pursue, we find it necessary to indulge in an extensive review of the facts before discussing the merits of the arguments before us.

The land involved in this litigation, along with much of the surrounding property, was originally owned by Griffin's father and referred to as the Griffin Marsh Land. On August 2, 1934, a fifty-foot strip of land running north to south across the Griffin Marsh Land was deeded to the state for the purpose of constructing a public highway; this strip is now Great Island Road. The state was also given littoral rights to build bulkheads along the waterfront, to deposit any spoils from dredging work, and to construct State Pier No. 3. These projects were completed by 1936 just after the father's death, at which time his daughter, plaintiff in this suit, took possession of the land. A decade later, with the long-range goal of developing a port facility, the state, acting through its Department of Public Works, Division of Harbors and Rivers, condemned three parcels of the Griffin Marsh Land. Two of the parcels were located in Narragansett in the village of Galilee and the third was situated in that section of Narragansett known as Jerusalem.

More specifically, on March 5, 1946, the state took 17.7 acres of land east of Great Island Road in Galilee and 14,500 square feet of land north of the landing for State Pier No. 3 between the bulkhead and Great Island Road. Shortly thereafter, on May 23, 1946, the remainder of Griffin's Galilee waterfront land was taken. This parcel comprises an area that runs northerly from the Champlin's Fish Market building to the United States Coast Guard Station and then onto State Pier No. 3. Finally, on August 22, 1946, the state condemned 1.09 acres of waterfront land owned by Griffin in Jerusalem on the west side of Point Judith Pond. Upon completion of the condemnation proceedings, the state assumed all leases existing between Griffin and her tenants at the time.

In response to the condemnations, Griffin, through her then attorney, the late James O. Watts, brought three separate actions in Superior Court for the assessment of damages against the state. One action was reached for trial in May of 1947 and resulted in a judgment for Griffin in the amount of $27,475. The state filed a motion for a new trial, after which Griffin instructed her attorney to negotiate a full settlement of her claims regarding all three parcels. Following an extended negotiation period, on March 30, 1948, the state agreed to pay Griffin $80,100 for her land in exchange for a general release and quitclaim deed, which read in pertinent part as follows.

### DEED

"I, J. ELIZA GRIFFIN, of the Town of South Kingstown, County of Washington, State of Rhode Island, for consideration paid, grant to the STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS with Quit-Claim Covenants

"All my right, title and interest in and to any and all land wheresoever located within the limits of condemnation, * *."

RELEASE

"NOW, THEREFORE, I, J. Eliza Griffin, in consideration of eighty thousand one hundred and 00/100 ($80,100.00) dollars to be paid by the State of Rhode Island, the receipt of which is hereby acknowledged, * * * do hereby remise, release and forever quit claim unto the State of Rhode Island all and all manner of actions, causes of actions, debts, dues, claims and demands, both in law and equity, and without limiting the generality of the foregoing, especially for the value of the land taken as aforesaid and any and all damages incident or related to said taking, which against said Department of Public Works on behalf of the State of Rhode Island, or the said State of Rhode Island ever had now have or ought to have, for or by reason of any matter or thing from the beginning of the world to the day of the date of these presents."

Griffin and the state then went their separate ways until August 19, 1962, when in response to a growing demand for dock space, the state took the last parcel of land involved in this litigation. This parcel, situated on Little Comfort Island, was designated as lots numbered 6 and 7 on the land plat maps of Narragansett.

From 1948 the state has utilized the Griffin property condemned in 1946, along with adjacent lands, to develop a port facility. According to the evidence adduced before the trial justice, this development is an ongoing project costing millions of dollars. Among other things, the project has resulted in the construction and repair of bulkheads, breakwaters, piers, roads, parking lots, and a sewer system; the dredging and redredging of the harbor; development of a sandy state beach; and the repair and replacement of docks, riprap, and breachway. Additionally, the land in the port area has been used for deposits of spoils from dredging and redredging operations, for the operation of fish-processing plants, and for the

provision of auxiliary services to the commercial fishing fleet, charter-boat fleet, pleasure craft, and ferry to Block Island. Furthermore, the University of Rhode Island makes use of the port facility for its nurseries and its various shell and fish studies, and the Division of Fish and Wildlife maintains a fisheries laboratory on the site.

The auxiliary services alluded to above include not only direct support for the marine industry, such as a boat-engine-repair shop, storage facilities, and net-drying areas, but also retail businesses such as restaurants, markets, and a hotel (the Dutch Inn) to serve the boat crews, employees of local industries, and tourists. Because of the improvements made to the port, it has been successful in attracting several major fishing tournaments, including the Atlantic Tuna Tournament, the Swordfish Tournament, and the Striped Bass Tournament. These and other events have drawn thousands of tourists to the area who are in turn served by the local retail establishments.

Future expansion and development of the port will be guided by a plan prepared by the Coastal Resources Management Council. Improvements will include, among others, the extension of piers, the establishment of additional fish-processing plants, the construction of additional facilities to accommodate an expanded commercial fishing fleet, and the possible development of a University of Rhode Island fishing school and fish-industry museum. Ultimately, as funds become available, the Galilee facilities will be made completely available to the commercial fleet, and the area condemned on Little Comfort Island in 1962 will be developed as a marina for pleasure craft.

In explaining the commencement of this suit some twenty-seven years subsequent to the original condemnations, Griffin testified that she only just became aware of a possible "constitutional right of preemption" in her properties in 1972 when she met her present counsel. In 1973 Griffin filed an action against the Director of the Depart-

ment of Transportation; in 1974 she filed a similar action against the Director of the Department of Natural Resources, now the Department of Environmental Management. Griffin joined both directors as parties because of an apparent overlap of functions between the two departments. In G.L. 1956 (1977 Reenactment) § 42–17.1–2 (1982 Cum.Supp.), the Director of Environmental Management is authorized to exercise all the functions and duties previously vested in the former Division of Harbors and Rivers of the Department of Public Works. Likewise, enumerated among the powers granted to the Director of the Transportation Department in § 42–13–1 (1982 Cum.Supp.) is the implementation of programs for port and waterways facilities and the management of port properties and state piers. Consequently, these actions were consolidated for trial and heard before the trial justice in December 1978.

Our attention now shifts to selected issues raised by Griffin and the conclusions of law reached by the trial justice. However, before discussing the merits of the substantive issues before us, we shall first dispose of Griffin's contention that the trial justice erred in vacating a default judgment entered against defendant on February 2, 1973.[1] Chronologically, the following sequence of events occurred. Griffin instituted the instant action by a summons and sworn complaint dated January 9, 1973, and served upon the then Director of Transportation, Robert J. Rahill. No entry of appearance was filed on behalf of Rahill, nor did he plead or defend as provided by the rules. Consequently, Griffin, pursuant to Rule 55 of the Superior Court Rules of Civil Procedure, applied for and was granted a default judgment. On February 15, 1973, Rahill filed a motion to vacate the default judgment and to extend the time to answer. This motion was granted by the court on March 23, 1973, over Griffin's objection. The trial justice vacated the default judgment because he found that the complaint

served upon the Director of Transportation had been mislaid during a period of change between administrations and further that the Attorney General was unaware of the fact that suit had been instituted.

■ Griffin maintains that the trial justice erred by vacating the default judgment in the absence of an affidavit of meritorious defense under Rule 60(b). We disagree. The record indicates that prior to entry of the default judgment, the Attorney General, an indispensable party to this action, had not been served with the complaint. General Laws 1956 (1969 Reenactment) § 9–30–11. We have said on numerous occasions that rules relating to service of process must be followed and construed strictly. *Plantations Legal Defense Services, Inc. v. O'Brien,* R.I., 413 A.2d 486 (1980); *Rosen v. Rosen,* R.I., 404 A.2d 472 (1979); *Shannon v. Norman Block, Inc.,* 106 R.I. 124, 256 A.2d 214 (1969); *see also Langton v. Demers,* R.I., 423 A.2d 1149 (1980). Here failure adequately to serve the Attorney General effectively voided any default judgment entered. Under these circumstances, there is no necessity to make a showing of a meritorious defense under the rule because the movant has an "unqualified right to relief." *Shannon,* 106 R.I. at 132, 256 A.2d at 219. Consequently, the trial justice's actions in this instance were proper.

Having disposed of this preliminary matter, we turn to the constitutional challenges posed by Griffin. Regarding the property in Galilee and Jerusalem, Griffin maintains that the taking provision in effect at the time, namely, G.L. 1938, § 27, as amended by P.L. 1945, ch. 1650, was unconstitutional as an invalid delegation of legislative power. Griffin also alleges that the condemnations were not for the "use and benefit of the public" as required by the statute and that the condemnations represented an unreasonable, arbitrary, and capricious taking of private property in bad faith in violation

---

1. We declined to rule on this question in *Griffin v. Rahill,* 112 R.I. 549, 313 A.2d 374 (1973), because, at the time, the action of the trial justice in granting the motion to vacate was nonappealable as an interlocutory order. *Id.* at 550, 313 A.2d at 374.

of the United States and Rhode Island Constitutions. Concerning the latter contention, Griffin insists that the state took more land than was necessary for the purposes set forth in the statute. Furthermore, Griffin maintains that she has a constitutional right of preemption as guaranteed by article XVII of the amendments to the Rhode Island Constitution. In particular, she charges that the existing leases pertaining to her former properties are illegal and void because the state failed to offer her the right to rent or lease the properties prior to leasing them to third parties.

With regard to the property condemned on Little Comfort Island in 1962, Griffin alleges that the taking was similarly unreasonable, arbitrary, and capricious and that it exceeded the authority delegated by statute, thereby violating both Federal and State Constitutions.

At the outset, we hasten to point out that except for the reasons delineated below, we would ordinarily decline to reach the constitutional questions raised pertaining to the 1946 condemnations because of the general release and quitclaim deed signed by Griffin. The deed quitclaimed all of Griffin's "right, title and interest" to the properties, and it contained no express limitations on the estate conveyed. Under our statutes, absent specific mention of an excepted or reserved right or interest, the conveyance passes all rights, including future interests, appertaining to the land. General Laws 1956 (1969 Reenactment) §§ 34–11–4, –28, 34–4–11. As far as the release was concerned, by its clear and unambiguous language, Griffin was to forfeit "forever" all "manner of actions, cause of actions, debts, dues, claims and demands" against the state arising from the taking of her land and "any and all damages" related to the taking.

On past occasions, we have specified the conditions under which a release, valid on its face, may be set aside. In *Boccarossa v. Watkins,* 112 R.I. 551, 313 A.2d 135 (1973), a

personal-injury action, we reiterated the rule that an executed release of a claim is valid absent an affirmative showing that the release was obtained by fraud, misrepresentation, an overreaching on the part of one of the parties, or a showing that a material mistake had occurred. *Id.* at 554–55, 313 A.2d at 136–37. Our rationale in adopting this rule was that settlements serve a valuable function by disposing of controversies before they enter the court system, thereby relieving the congestion on our dockets and calendars. If releases were taken lightly and rescinded, the incentive to settle would dissipate and parties opting for such a course could never be secure from litigation. "Finality has its virtue." *Id.* at 557–58, 313 A.2d at 138.

We can discern no reason why this rule should not equally apply in the present situation. The record reveals that Griffin was well represented by a distinguished and learned counsel who testified that Griffin understood the documents she signed. Griffin was both a highly educated person with a professional degree and an astute businesswoman who managed in excess of fifteen different parcels of property. Given these circumstances, we are convinced that the release was not obtained by fraud, misrepresentation, or mutual mistake.

Parenthetically, we note that Griffin is questioning the constitutionality of the very statute that she previously invoked to exact her remedy. Similar challenges have been routinely rejected by this court in the past. *See, e.g., Lynch v. King,* 120 R.I. 868, 875, 391 A.2d 117, 121 (1978); *De Prete v. Farm Bureau Mutual Automobile Insurance Co.,* 83 R.I. 10, 12, 111 A.2d 837, 838 (1955). Ordinarily, such a procedural posture would serve as an absolute bar to Griffin's actions.[2]

Although this case might have been dismissed on the grounds discussed above, we find it necessary to reach several of Griffin's constitutional contentions be-

---

**2.** We also note that the doctrine of laches, had it been raised as an affirmative defense at trial, might also have estopped Griffin from bringing this action at the present time.

cause of certain rulings made by the trial justice and their effect upon the 1962 condemnation, their impact on pending lawsuits, and the great weight and importance that we ascribe to these issues. We do so, keeping in mind the well-settled principle that this court will not pass on the constitutionality of a statute on a broader basis than required by the circumstances. *State v. Peloquin,* R.I., 427 A.2d 1327, 1329 n. 6 (1981). Griffin's charge that her land was not taken for a public purpose because some of it has been leased to private concerns is unwarranted. It cannot be seriously contended that the development and operation of the port as described above is not a public facility serving a public use or purpose. The trial justice found that any benefits accuring to private businesses were incidental to the benefits derived by the public. We concur with this assessment. The public nature of a project is not eradicated because private enterprise becomes involved. In *Romeo v. Cranston Redevelopment Agency,* 105 R.I. 651, 660–61, 254 A.2d 426, 432 (1969), we echoed the sentiments expressed in *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), rejecting an argument similar to the one advanced by Griffin that a taking was unconstitutional because the land was put to private rather than public use. In *Berman* the Court ruled that once a public purpose had been established, the means of executing the project was for the Legislature to decide. "The public end may be as well or better served through an agency of private enterprise than through a department of government * * *." *Id.* at 33–34, 75 S.Ct. at 103, 99 L.Ed. at 38.

With regard to what constitutes a "public use," we have said that this is a judicial question that may not be given a "rigid, unbending, absolute definition." *Romeo,* 105 R.I. at 658, 254 A.2d at 431. Views on this issue necessarily vary with the changing conceptions of the functions and scope of government. "The modern trend of authority is to expand and liberally construe the meaning of 'public use.'" *Id. See also Opinion to the Governor,* 113 R.I. 586, 594,

324 A.2d 641, 646 (1974); *Opinion to the Governor,* 112 R.I. 151, 155, 308 A.2d 809, 811 (1973).

Furthermore, in *Opinion to the Governor,* 113 R.I. at 594, 324 A.2d at 646, it was stated that if the principal purposes and objectives set out in a legislative enactment are public in nature, incidental benefits to private interests are not controlling. According to the record before us, the purposes guiding the development of the port facilities include the improvement of navigation, promotion of the fishing industry, enhancement of recreation, and encouragement of tourism. The uncontradicted evidence establishes that the economic activity generated by the port translates into millions of dollars and hundreds of jobs. We can scarcely label these purposes and results as primarily "private" rather than "public" in nature.

■ Griffin also complains that the former Department of Public Works exceeded its statutory authority when it condemned her properties. That department was authorized in § 27 of chapter 1650 of the Public Laws of 1945 to condemn "any portion of real property, tide flowed lands * * riparian and littoral rights * * * bordering on tidewater in the state and as much of the uplands adjacent thereto as the director of public works shall deem expedient."

To prevail on this issue, Griffin's burden was to show that the condemning agency "exceeded its delegated authority by an arbitrary, capricious or bad faith taking of private property." *Romeo,* 105 R.I. at 665, 254 A.2d at 434. No evidence exists in the record to suggest that the state even remotely acted in such a manner in the instant case. To the contrary, the port's development over the last thirty-five years has confirmed the foresight of the condemning agency's original actions. Concerning the Little Comfort Island land, the fact that the state has not yet dredged it because of the present lack of funds in no way justifies the characterization of the original taking as capricious or arbitrary.

Development of this land will eventually proceed according to a well-formulated plan designed to maximize the economic potential of the area.

We shall next consider Griffin's claim that the state violated her constitutional right of preemption under article XVII of the amendments to the Rhode Island Constitution. In pertinent part, article XVII reads as follows:

"Acquisition of excess land by public agencies.—The general assembly may authorize the acquiring or taking in fee by the state, or by any cities or towns, of more land and property than is needed for actual construction in the establishing, laying out, widening, extending or relocating of public highways, streets, places, parks or parkways * * *. After so much of the land and property has been appropriated for such public highway, street, place, park or parkway as is needed therefor, the remainder may be held and improved for any public purpose or purposes, or may be sold or leased for value with or without suitable restrictions, and in case of any such sale or lease, the person or persons from whom such remainder was taken shall have the first right to purchase or lease the same upon such terms as the state or city or town is willing to sell or lease the same."

Relying upon this constitutional provision, Griffin maintains that the state should have first offered her the opportunity to rent or lease her condemned land before offering it to third parties. She advances an equal-protection argument in support of her position that the port facilities come within the ambit of article XVII. The trial justice agreed that article XVII was applicable to the condemnations of Griffin's property but held that she had waived or conveyed her rights to the 1946 properties when she signed the release and was therefore estopped from claiming them at this time. However, with respect to the property condemned in 1962, the trial justice ruled that Griffin retained the first right to purchase or lease the property if the state chose ever to sell or lease it in the future.

After careful examination of the amendment's text and its historical background, it is our considered opinion that the trial justice was mistaken in holding that article XVII was applicable in the instant matter. By its terms, the amendment applies only to the taking of lands used for "public highways, streets, places, parks or parkways." When construing constitutions, one must give the words their usually accepted meaning. *Bailey v. Baronian,* 120 R.I. 389, 391, 394 A.2d 1338, 1339 (1978). Keeping this guideline in mind, we can comfortably state that the term "port" does not appear in the language cited, nor can its presence be inferred by any stretch of the imagination. It seems to us that the term "place," read in the context of the clause in which it appears, refers to a court or square or short street. This result is in accord with the rule of construction that a general term in a list of specific terms should be considered as limited by the more specific terms. *Montaquila v. St. Cyr,* R.I., 433 A.2d 206, 214 (1981). It is also in accord with the marginal note to chapter 1224 of the 1915 Acts of the General Assembly approving the proposed amendment for submission to the voters as article XVII, which note mentions "Excess condemnation of land for *highway* or *park* purposes." (Emphasis added.)

Viewing the amendment to "examine the state of things existing when it was framed and adopted," *Bailey v. Baronian,* 120 R.I. at 392, 394 A.2d at 1339, lends further support to our ruling. The amendment was promulgated at a time in which literal and very restrictive meanings were given to the phrase "public use." *Romeo v. Cranston Redevelopment Agency,* 105 R.I. at 658–59, 254 A.2d at 431. Such restrictive readings were giving rise to claims for damages from construction activities incidental to the building of highways and railroads. For instance, a town or its agents could be found guilty of trespass during the reconstruction of a road if there was an entry

**1348** ■

upon the lands of an adjacent property owner. *Chapman v. Pendleton,* 34 R.I. 160, 169, 82 A. 1063, 1067 (1912). Construction activities were consequently confined to the roadbed, thereby hampering efficient road-building methods. In reaction to these restraints, the Legislature in 1914 drafted article XVII.

It is significant to note that at the time the amendment was enacted, public agencies were authorized to acquire properties by eminent domain for a variety of projects. In particular, four years prior to the submission of the amendment to the voters, the Legislature had enacted P.L. 1910, ch. 568, authorizing the acquisition of real property by eminent domain for the construction of port facilities in several cities. The Legislature, if it had so desired, could have expressly included a reference to port facilities in the language of the amendment. Such a conscious decision was made with respect to parks and parkways. The absence of any such reference consequently evidences an intent not to include such facilities within its ambit. *See State v. Feng,* R.I., 421 A.2d 1258, 1264 (1980).

■ Our ruling that port facilities are outside the scope of article XVII necessarily invalidates the trial justice's declaration that G.L. 1956 (1980 Reenactment) § 46–5–15 is unconstitutional. That chapter entitled "Construction of Port Facilities" authorizes the Director of Environmental Management to lease or sell land acquired under but no longer required for the purposes set out in the statute, provided that the original landowner(s) are offered a prior right to lease, purchase, or reinvest themselves of such land. The director's authorization to lease or sell the land to the original landowners is subject to specific time and other restrictions. The trial justice was of the opinion that these restrictions impinged upon the constitutional right to preemption guaranteed by article XVII. He consequently declared the statute unconstitutional.

The trial justice overlooked the fact that the statute that tracks article XVII is not § 46–5–15 but rather G.L. 1956 (1977 Reenactment) § 37–7–4 pertaining to the reinvestment in original landowners of property taken for streets and parks. Indeed, the language used in § 37–7–4 referring to "highways, streets, places, parks or parkways" is identical to the language used in the amendment. Consequently, the trial justice erred in applying § 46–5–15 to article XVII, and his declaration that the statute is unconstitutional must be set aside.

Accordingly, for the reasons stated above, the state's appeal is sustained and Griffin's appeal is denied in its entirety. So much of the judgment that finds the preemption rights guaranteed by article XVII applicable to land taken for the construction of port facilities is hereby vacated as is that portion declaring § 46–5–15 unconstitutional. The record in this case is remanded to the Superior Court for entry of a new judgment in accordance with this opinion.