Arthur Markewich, J.
In this proceeding, the City of New York acquired title in fee to certain real property, as described in the title, for the widening of Bruckner Expressway, together with certain temporary and permanent easements, and to certain park strips. Title vested in all parcels, except Nos. 23A and P23, on June 1,1966, upon entry of the condemnation order, and to the latter two parcels on November 4, 1966. The statu *874 tory view and numerous subsequent inspections were made by the court. In April, 1967, hearings were held as to the valuation of 35 obviously residential parcels of those included in this proceeding, and a decision rendered thereon May 15, 1967, which, in due course, proceeded to final decree. This trial, of more than 40 court days in duration, was concerned with valuation of the remaining damage parcels in fee and all permanent and temporary easements; with one residential exception (Damage Parcel 28), the subject parcels may be generally described as commercial, or available for commercial and industrial use.
The problem of valuation must inevitably concern itself to an extent with trends and potentials. The area under consideration has developed at such a fast rate that witnesses who testified on the subject were unable to provide a comparison with any other area in The Bronx. Not only have changes in use and zoning been accomplished, but a strong trend continues in that direction, so that a practically universal change in the area to commercial use is found to be not only the great probability but, indeed, inevitable. That probability is an important influence in the market place and is to be considered regardless of the physical factors presently obtaining in ascertaining values. (Matter of Incorporated Vil. of Garden City, 9 Misc 2d 693, affd. 4 A D 2d 783, mot. for lv. to app. den. 3 N Y 2d 708; Valley Stream Lawns v. State of New York, 9 AD 2d 149; Masten v. State of New York, 11 A D 2d 370, affd. 9 N Y 2d 796; City of Albany v. State of New York, 16 A D 2d 163; Albany Country Club v. State of New York, 19 A D 2d 199, affd. 13 N Y 2d 1085.)
One of the difficulties encountered during the trial was that, while the city’s appraiser admitted the likelihood of a zoning change, the land units he adopted failed to reflect such probability. The sales offered by the city in the proceeding were not particularly relevant. There was agreement that values had risen considerably along Bruckner Boulevard and that the early sales failed to reflect the values at vesting date. The analyses of these sales were not helpful. For example, city Sale 22 took place in 1962; the existing building was demolished shortly after the purchase, and thus the purchase price was allocable to land only. City Sale 24 did not reflect the market value because the street upon which the sale fronted was not accessible. City Sale 27 was a part of a larger overfall deal. City Sales 31, 39 and 40 were in residence zones at the time of the sale and have -since been rezoned C2. City S'ales 32, 33, and 34 were 1960 and 1961 sales, when values were considerably lower. City Sale 35 was a narrow strip, of value *875 only to the adjoining owner. City Sale 36 was low marsh land along a creek, partly under water. City Sales 41, 42, and 43 were on the service road to Cross Bronx Expressway, a limited ac'cess highway; not only did expressway traffic bypass these gas .stations, but, in the latter two, the exits from the expressway were at points beyond these gas stations.
City Sale 45 was a lease on DP 36 and does give some indication of land value in the area of the taking. The city was unaware that this was a ground lease which excluded the land on Noble Avenue, and would indicate a unit of $8.56 a square foot for C2-zoned land. Considering the fact that this was a 1955 lease and that values have since increased, little support is found for the city’s $4.50' square foot unit. The ground lease to Carvel and the ground lease to the amusement park all analyzed at $15 a square foot. The ground lease on Castle Hill Avenue and Bruckner Boulevard to "White Castle in a residence zone (R6) analyzed at $10 a square foot. The vacant land lease of DP 115 showed a land unit in 1962 of $12 a square fo’ot. The lease on DP 74 analyzed at $9.90 a square foot.
‘1 Rental value tends to prove fee value, because other things being equal, the income from property is a measure of its market value.” (Ettinger v. Weil, 184 N. Y. 179, 183.) (Also, see, Matter of City of New York [Blackwell’s Is. Bridge], 118 App. Div. 272; Jamieson v. Kings County El. Ry. Co., 147 N. Y. 322.) Factors of rental value should be given great weight by the court, and dramatic changes in rental value accordingly have great .significance in ascertaining land value. The city’s expert did say that, when the Korvette Shopping Center was opened in 1964 in the subject area, a large influx of shoppers resulted. The values that had theretofore obtained in the vicinity became devoid of meaning as a consequence. Despite this, the expert’s land units failed to reflect any significant increase whatever.
Nor did the expert give appropriate weight to land use. For example, he distinguished not at all between land used as a gas station and that otherwise employed. ‘1 Common experience bears out what is said in McMiehael’s Appraising Manual (3d ed.) at page 361 concerning the valuation of land adjoining gasoline station property: ‘ A most striking fact revealed in connection with the Valuation of gas station sites is that the value of land used for such purpose bears very little relation to the value of adjoining lands. It is frequently found that for the use to which suCh sites are being placed they are worth from five to ten times as much as adjoining land. ’ ” (Breitel, J., Matter of City of New York [Throgs Neck Expressway], 16 A D 2d 570, n. 575.)
*876 AH of these factors — the changes of use and the anticipation of rezoning as indicative of a trend, the increases in rental value, the particular uses of land — have been accorded great weight by the court.
An is'sue which received almost disproportionate attention during the trial is that of the Valuation to be accorded to the permanent grading easements (PGE’s). On February 14,1968, while ruling on an objection to evidence during the trial, the court informally forecast the eventual decision to the effect that such easements would be evaluated as though full fee taking. Reasons for so ruling were then stated, imprecisely, to be sure, at that time, but since found echoed in excellent exposition in Matter of City of New York (Queens Midtown Expressway) and in Matter of Whitestone Expressway, both by Conroy, J. (Special Term, Part IV, Queen's County, N. Y. L. J., June 28, 1968, p. 15, cols. 4, 5), and therefore require little further discussion here. To the same effect, see Matter of City of New York (Bruckner Boulevard), Herman, J., Special Term, Part H, Bronx County (N. Y. L. J., April 9, 1968, p. 16, col. 5).
In .short, the city takes an incongruous position, i.e., that this permanent easement is actually temporary, resulting in no permanent harm or change, and is to be compensated for accordingly on the basis of length of period of encumbrance, with some slight resultant reduction in value. This incongruity is illustrated, for instance, by the circumstance that, immediately adjacent to one of these “ permanent-temporary ” easements (BCE 145), there is found THE 145, an easement taken for the sole purpose of facilitating the demolition of structures on PGE 145.
Though the city argues that the reservation in the certificate of approval of acquisition of a right to apply in futuro to the Mayor for extinguishment of these permanent easements — a right the property owners would have enjoyed even without such reservation — renders them temporary arid requires their evaluation accordingly, the court may not consider any such possibility and must evaluate the interest taken as of the time of taking, without reservation of any kind. Further, such extinguishment can never be truly an extinguishment, for the heaps of earth and other materials must remain on the easement area (or an acceptable substitute structure be provided) to furnish lateral support a's long as the highway remains.
In practically all instances, remainders of property will be landlocked forever inside these grading easements; in the rare instances where some access remains, appropriate adjustment in valuation has been made. "What actually happens to the *877 easement areas is that an owner is left with nothing but a naked fee by this burden upon the land. The city argues that such landlocking damage is not compensable, resulting, it is claimed, from failure of the owner to cause Ms property to be brought to the established grade. To begin with, tMs is a constitutional proceeding in eminent domain; it is not a .statutory change-of-grade proceeding. Further, the condemnor takes property as it is found when condemned. Indeed, in many of the instances considered, it would not have been possible for most of the claimants to have engaged in the businesses for which variances had been granted in the past by the city’s authorized agency had they raised the level of the property to the established grade and had they not remained instead at the then existent Bruckner Boulevard level. Further, close scrutiny of the damage map and its accompanying detailed sketches of grade changes presents a picture of effective land-locking even in those places where the difference in grade resulting from the building of slopes is de minimis, actually no more than an inch or so, because of denial of access to the owner of the fee.
It is accordingly now held, to formalize the ruling made during trial, that BGE’s are valued as though full fee takings. (See Weber v. State of New York, 25 A D 2d 584; Morton v. State of New York, 8 A D 2d 49, app. dsmd. 6 N Y 2d 993, mot. for Iv. to app. den. 7N Y 2d 708; Spinner v. State of New York, 4 A D 2d 987; North Carolina State Highway Comm. v. Black, 239 N. C. 198; Crouch v. State of New York, 218 App. Div. 356, 360; Heard v. City of Brooklyn, 60 N. Y. 242; Roby v. New York Cent. & Hudson Riv. R. R. Co., 142 N. Y. 176; Kahlen v. State of New York, 223 N. Y. 383; Minesta Realty Co. v. State of New York, 29 A D 2d 335; Matter of Board of Water Supply, 277 N. Y. 452; Berman v. Parker, 348 U. S. 26; Metropolitan Opera Assn. v. City of New York, 19 N Y 2d 78; Wolfe v. State of New York, 22 N Y 2d 292; Matter of Culver Contr. Co. v. Humphrey, 268 N. Y. 26; Matter of City of New York [A & W Realty Corp.], 1 N Y 2d 428.)
Based upon the evidence and after due consideration and deliberation, awards are made, as set forth in the following schedules [schedules omitted], for fee parcels, for permanent grading easement (BGE) parcels, for temporary demolition (TDE), removal (TEE), and construction (TCE) easement parcels, and for fixture claims.