Edward J. Greenfield, J.
Petitioner, an irate citizen of the City of New York and the beleaguered owner of a motor vehicle, on June 18, 1970 left his car parked at the curb on West 60th Street, in an area designated as a “ tow-away zone ”. Upon Ms return, he found his car was no longer there. It had been towed away and impounded by the Police Property Clerk, at a pier at West 56th Street and the Hudson River. In order to redeem Ms car, he was compelled to pay a 11 removal charge ” of $50 and was also subject to a $25 parking fine. He made the payment under protest; he then filed a notice of claim upon the City of New York, challenging the validity of the charge, and demanded its refund. He did not at any time contest the propriety of the $25 fine which was imposed for the offense of illegal parking.
In this article 78 CPLR proceeding, petitioner seeks a declaration that the issuance by the Police Commissioner of Temporary Operating Procedure No. 20 of the Rules and Procedures of the Police Department of the City of New York, wMch became effective June 1, 1970, is illegal.
The propriety, and indeed, the effectiveness of the city’s tow-away program for the midtown area has for some time been the. subject of lively controversy. Obviously, the city is faced with enormous problems of traffic control, given the influx into Manhattan of an estimated 700,000 vehicles a day, with very few off-street parking facilities available. Faced with several alternative ways of dealing with the problem, the city has chosen the *72 expedient of total prohibition of curbside parking in designated areas. The prospect of fines not having discouraged the desperate competitors for parking space, the city, in order to put teeth into the prohibition, and open the traffic lanes for movement, has acted to tow away illegally parked vehicles since December, 1961. First, the tow-away program applied to cars illegally parked on certain designated express streets and cars were removed by the Department of Sanitation tow trucks. Then an expanded number of streets were designated as tow-away zones and in November, 1965, Police Department tow trucks were assigned to the program. In the third stage, the Police Department issued Temporary Operating Procedure No. 20, expanding the tow-away zone from 34th Street to 66th Street, and a “ removal fee ” of $25 was set. In the fourth stage, the tow-away zone was expanded by order of Mayor Lindsay to cover the area from 23rd Street to 72nd Street, river to river. In this fourth stage, by amendment of Paragraph 5 of Temporary Operating Procedure No. 20, the removal fee was doubled from $25 to $50, effective June 1, 1970. It is this particular amendment, increasing the ‘ ‘ removal fee ’ ’ which is under challenge in this proceeding.
The fine for illegal parking in mid-Manhattan of $25, coupled with the removal fee of $50, imposes a total $75 penalty on the person whose car is ticketed. This, together with the inconvenience and delay of reclaiming one’s car from the pound, would presumably be high enough to make anyone think twice before undertaking the risks of parking in a tow-away zone. Nevertheless, illegal parking persists. The penalty cannot, however, be raised arbitrarily to whatever figure would discourage the brashest and most foolhardy parker. “Excessive fines” are constitutionally prohibited (U. S. Const., 8th Arndt.; N. Y. Const., art. I, § 5). A maximum fine is set for traffic infractions and parking violations. (Vehicle and Traffic Law, § 1800; New York City Charter, § 883, subd. [a]; Administrative Code of City of N. Y., § 883a-3.0, subd. b.) The actual parking fine which can be imposed is limited by law. The question posed in this case is whether the additional $50 charged for an illegally parked vehicle, beyond the stated fine, is, in fact, a penalty in disguise, imposed by the city beyond its authorized powers and to evade the limitation, or whether it is a reasonable charge for the actual expenses of removal of a vehicle blocking its streets.
Authorization for removal and the imposition of a removal charge is contained in the Vehicle and Traffic Law (§ 1204, subd. [b], par. 1) which provides: “Whenever any police officer, or in a city having a population in excess of one million any person *73 designated by the commissioner of traffic of such city * * * finds a vehicle unattended where it constitutes an obstruction to traffic, or any place where stopping, standing or parking is prohibited, such officer is hereby authorized to provide for the removal of such vehicle * * * to a garage, automobile pound or other place of safety. ’ ’
Subdivision (c) of section 1204 provides: “ The owner or other person lawfully entitled to the possession of such vehicle may be charged with a reasonable cost for removal and storage, payable before the vehicle is released.”
The Police Commissioner of the City of New York is specifically empowered by sections 434 and 435 of the New York City Charter to execute all laws and the rules and regulations of the Police Department and, “ subject to the provisions of law and the rules and regulations of the commissioner of traffic, regulate, direct, control and restrict the movement of vehicular * * * traffic for the facilitation of traffic and the convenience of the public, as well as the proper protection of human life and health ”.
The Police Commissioner of the City of New York, in setting and then increasing the removal fee from $25 to $50, effective June 1, 1970, purported to act pursuant to the aforesaid provisions of the City Charter and of the Vehicle and Traffic Law. It is clear that under the law the owner of an illegally parked vehicle may be charged “ with a reasonable cost for removal ”. Is $50, in fact, the reasonable cost for removal of a parked car by the police in mid-Manhattan? Petitioner contends that it is not, and in support of his contention points to section 436-7.0 of the Administrative Code, which fixes the maximum legal rates for commercial towing vehicles at $4 for the first mile and $1 for each additional mile. These charges are set in order to award private towing firms with reasonable but not excessive profits. Petitioner’s ear was towed a total distance of less than a mile, so he urges that $4 is the maximum reasonable cost. Respondent, on the other hand, makes little of that disparity, and insists that in fact, it costs the Police Department more than the $50 now being charged for the removal of an illegally parked vehicle.
It is the contention of the Police Commissioner that during the year 1969, before the removal fee was doubled, it cost $58.04 for the department to remove each vehicle. This figure is arrived at by a computation giving the total cost of the ‘ ‘ Tow-Away Program ” in that year as $6,317,841. During that year, 108,856 vehicles were towed away. Division of one figure into *74 the other gives a total alleged cost per tow of $58.04. If, indeed, this were the fact, there could be no quarrel with the removal fee which had been fixed, however unpalatable it might be for those who bring their cars into mid-Manhattan. Even if there were some area of dispute as to the propriety of some of the figures included in the computation of total cost, there would, at the least, have to be a hearing to resolve the disputed questions of fact. However, even accepting the city’s own figures, the court finds that the claim as to the actual total cost and the unit cost of each tow is wholly unfounded, and that the fixation of the so-called removal fee or towing charge by the Police Commissioner is illegal, unreasonable, arbitrary and capricious.
This conclusion is not based on the huge discrepancy between public and private towing charges. While the difference between the towing charge which the Police Commissioner allows for private commercial firms and the charge that he has set as being reasonable under the police tow-away program is startling at first glance, the two may not be completely comparable. The city tow-away program does have a different objective, is different in scope and volume, and must of necessity be handled in somewhat different fashion than the towing away of a disabled vehicle removed for the purpose of making repairs. An analysis of the Police Department figures indicates, however, that a discrepancy between the two sets of towing charges cannot be accounted for on any such basis.
On the basis of the figures submitted by respondents, the police tow-away program involves the efforts of 280 policemen, 102 civilians, 63 tow trucks and 14 radio motor patrol cars; 365 cars are towed away each day except Sunday; 97% of them are retrieved by their owners the same day. Thus, on the basis of respondents’ figures, 382 men are required to handle 365 cars brought in daily. While this figure may suggest some degree of inefficiency in the program, the legality of the removal charges is not to be judged on the basis of whether under other circumstances the city could do better and with greater productivity per person. Closer scrutiny reveals, however, that the large number of personnel involved and the inordinate costs are ascribable solely to the fact that respondents’ computations include many costs other than the actual reasonable cost of removal of a vehicle.
While the removal of an illegally parked vehicle, under the law, is a police function, not all police functions in connection with parking and traffic control can be classified as actual removal costs. Many, if not most, of the costs included in respondents’ computation are ordinary police costs pure and *75 simple — the costs of law enforcement and not the costs of removing vehicles.
In arriving at a cost per tow of $58.04, the respondents offer the following summary, with underlying figures giving greater supporting detail:
COST
ITEM TOTAL COST PER TOW
1. Issuance of summons...................... $1,111,740 $10.21
2. Cost of Radio Motor Patrol................ 534,724 4.91
3. Wages of towing operators................. 1,776,060 16.32
4. Depreciation and operation of tow trucks.... 100,800 .93
5. Wages of pier parkers and security personnel. 619,398 5.69
6. Administrative and operative costs for collection and record keeping.................. 1,084,052 9,96
7. Supervision....................... 270,284 2.48
8. Pier rental value.......................... 623,534 5.73
9. Support services ....................... 197,249 1.81
Total cost.. $6,317,841 $58.04
Item 1, which is a substantial part of the alleged total cost, consists of wages of 70 patrolmen assigned to summons duty with the Parking Enforcement Squad. Obviously, their job is to issue a summons for a violation of the law. They do this whether or not the vehicle has to be towed away, and the costs of issuing a summons (for which a separate fine of $25 is charged) can in no way be attributed to the ££ reasonable cost of removal”. Tagging is one thing, towing is quite another.
Item 2 likewise consists of wages for 32 patrolmen assigned to radio motor patrol on the Parking Enforcement Squad, and the cost of operation of 10 radio motor patrol cars. These costs too are the police costs, incurred in enforcing the law, and are not the costs of vehicular removal. Falling in the same category are administrative costs for the Parking Enforcement Squad, which include the salaries of the commanding officer of that squad, the desk lieutenant, the sergeants, the roll-call clerks, and detectives for the Accident Investigation Squad (part of item 6). Similarly, the costs of checking the stolen car file, and other police investigative costs are not towing or removal costs.
Heaping Pelion upon Ossa, items 7 and 9, the costs of supervision of the Parking Enforcement Squad and the costs of police support services (alleged allocable charges) for central headquarters administration, personnel, building maintenance, accountants, police payroll, etc., are interesting examples of cost accounting running rampant. These are police charges direct and indirect, arising out of the duty mandated on the police force to enforce the law. They would be incurred whether *76 or not a single vehicle were towed away. To ascribe as ‘ ‘ reasonable cost of removal ” a portion of the salaries of the police quartermaster and the total salaries of the various captains, lieutenants, sergeants and patrolmen involved in general duties for the Parking Enforcement Squad and other police activities is improper, dishonest and arbitrary. Yet these items alone amount to almost half of the alleged $58 per tow cost. None of the following amounts, which are general law enforcement costs, can be considered in the computation of the removal costs of illegally parked vehicles.
ORDINARY POLICE COSTS IMPROPERLY ATTRIBUTED TO TOWING
COST
ITEM TOTAL COST PER TOW
1. Issuance of summons...................... $1,111,740 $10.21
2. Parking Enforcement Squad — radio cars and personnel.............................. 534,724 4.91
6. Parking Enforcement Squad- — administrative costs .................................. 617,585 5.67
7. Parking Enforcement Squad — supervision.. 270,284 2.48
9. Support services ......................... 147,249 1.81
Total.. $2,731,582 $25.08
In a second questionable category are the amounts attributed to pier rental value (item 8). Four piers are used in connection with this program; the two at 56th Street are used as the impounding area for cars first towed away. 97% of all cars towed away are redeemed from these piers. If they are not so redeemed, they are removed to one of the other two piers where storage charges of $5 per day are imposed. Since the provision for storage charges is entirely separate and apart from the removal charges, there is no basis for including in the computation of removal charges the alleged rental value of the two piers used solely for storage of the 3% of the unredeemed cars, which are charged extra for storage. Yet the rental value of the piers used solely for storage comprises over 70% of the total pier rental value.
Moreover, the total rental value of the piers is arrived at in wholly unrealistic fashion. It is not based on what comparable rents may be for private firms leasing such space, or upon any other effective guide for determining actual rental values. Rather, it is the result of the application of an arbitrary formula, in which the city has lumped together all capital costs attributable to the piers in the past (without depreciation), the value of the surrounding lands under water, plus the assessed valuation of the property, and capitalized them to arrive at a figure bear *77 ing no relation to market value, trends, or potential, or the actual use to which the property is put. (See Matter of City of New York [Bruckner Expressway], 58 Misc 2d 873, Markewich, J.) A motorist who has his car towed away would be amazed to learn that part of the cost of removal is the alleged value of the land under water in the area surrounding the piers! He would likewise be amazed to find that he is also being charged for, among other things, the costs of dredging around the piers in 1883, the costs of pier extension and rebuilding in 1914 and 1918, as well as the costs of the old pier sheds which were replaced.
It must be concluded that the given pier rental figure (item 8) is a wholly fictitious figure, amassed from improper items, excludable items, irrelevant items, and duplicated items, which account for an alleged $5.73 of the total towing cost.
It would appear that items 3 and 4, involving the costs of towing personnel and tow trucks, are properly attributable to “ a reasonable cost of removal”. Even here, however, some questions are raised. Wage costs are given both for 50 patrolmen assigned to towing cars and 98 civilian motor vehicle operators. However, an arbitration award, confirmed in a judgment filed January 7, 1969, provides that civilian motor operators exclusively were to be assigned to certain vehicles, including police tow trucks. A 100% civilian force of tow truck operators was contemplated. The job of the patrolman was restricted to tagging cars. Thus, inclusion of the wages of 50 patrolmen as tow car operators at $15,882 each is improper, and in fact duplicates the costs of wages of civilian tow truck operators (at $10,020 each). The wages of the police towmen, presumably no longer used, come to $794,100 or $7.30 of the tow cost per tow.
With respect to other items, it is not clear whether they are or are not properly includable. Thus, item 5 which covers operation and security of parking areas includes not only 14 patrolmen assigned the duty of parking towed vehicles on the piers, but also 10 patrolmen of the Parking Enforcement Squad responsible for security of department vehicles, and 15 patrolmen from the precinct for pier security. Some of these security charges would again appear to be police costs rather than towing costs, and that portion attributable to the expenses of operating and guarding the piers used only for stored and unredeemed vehicles would not be a proper charge for towing.
The wages of 47 other police officers are attributable to the Police Property Clerk as part of item 6 (record keeping). This *78 seems like quite a large number of men merely to handle fee collection and record maintenance for some 365 cars a day. It appears that an undetermined proportion of the Police Property Clerk personnel is involved in such duties as checking the vehicles for contraband, tracing stolen cars, and other police duties not connected with towing away illegally parked cars or handling the paper work involved in inventorying and redeeming them.
Summing up, out of the entire cost breakdown supplied by respondents, it would appear that only $10 per tow (the wages of the civilian tow truck operators and the depreciation and operating costs of the tow trucks) are indisputably part of the costs of removal. (This court will not pass on the efficiency and productivity of having 63 tow trucks removing an average of 6 cars per truck, per day.) Approximately $35 of the total alleged cost per tow is indisputably not part of the reasonable cost of removal, but are charges more readily ascribable to other aspects of police work. The remaining $13 appears to be a legitimate charge in part, and questionable in part.
While this court cannot fix the exact cost of removal with any degree of confidence or certainty, it has no hesitancy in declaring that the amount fixed by the Police Commissioner’s order, effective June 1, 1970, is not based on the actual and reasonable cost of removal, and that this figure has been arrived at arbitrarily and capriciously. In fact, upon the argument of this motion, the Corporation Counsel was unable to produce the figures allegedly relied upon by the Police Commissioner, and'additional time was asked ‘ ‘ so that the figures could be put together. ’ ’ There is no indication in the papers before the court that the alleged cost analysis analyzed above was ever actually before the Police Commissioner or was considered by him prior to his issuing his directive.
The Police Commissioner, the Mayor, and other public officials, as are all other citizens, are subject to the mandate of the law and may not exercise arbitrary power in striving towards a proposed beneficent goal. The Police Commissioner has ample scope to act within the law. When he acts arbitrarily or capriciously and relies upon unfounded justifications for his actions, his directives cannot be judicially sanctioned.
The petition is granted, and paragraph 5 of Temporary Operating Procedure .No. 20 of the Bules and the Procedures of the Police Department of the City of New York, effective June 1,1970, is annulled.